# UNITED STATES *v.* CITIZENS & SOUTHERN NATIONAL BANK ET AL.

No. 73–1933. Argued March 19, 1975—Decided June 17, 1975

*Deputy Solicitor General Friedman* argued the cause for the United States. On the briefs were *Solicitor Gen-*

*eral Bork, Assistant Attorney General Kauper, Gerald P. Norton, Howard E. Shapiro,* and *George Edelstein.*

*Daniel B. Hodgson* argued the cause for appellees. With him on the briefs were *Michael A. Doyle, Walter M. Grant, Richard A. Posner,* and *Philip L. Roache, Jr.**

MR. JUSTICE STEWART delivered the opinion of the Court.

For many years the State of Georgia restricted banks located in cities from opening branches in suburban areas. To circumvent these restrictions in the Atlanta area, the Citizens & Southern National Bank (C&S National) formed the Citizens & Southern Holding Company (C&S Holding), and the latter company embarked on a program of forming *de facto* branch banks in the suburbs of Atlanta. This program involved, among other features, ownership by C&S Holding of 5 percent of the stock of each of the suburban banks (the maximum allowed by state law), ownership of much of the remaining stock by parties friendly to C&S,[1] use by the suburban banks of the C&S logogram and of all of C&S's banking services, and close C&S oversight of the operation and governance of the suburban banks. The expectation on all sides—by C&S, by the suburban banks, and by state and federal bank regulators—was that C&S would acquire these "5-percent banks" outright, and convert them into *de jure* branches, as soon as state law, or the Atlanta city limits,

---

*Cubbedge Snow* and *Charles M. Stapleton* filed a brief for the Independent Bankers Association of Georgia, Inc., as *amicus curiae.*

[1] Unless otherwise indicated, the term "C&S" refers generically to the C&S system of banking entities, including C&S National and its majority owned affiliates and C&S Holding, but excluding the 5-percent banks. The defendants in this suit—appellees here—are C&S National, C&S Holding, six of the 5-percent banks, and two banks in the Atlanta area, C&S Emory and C&S East Point, which are subsidiaries of C&S Holding. Taken together, these will sometimes be called the "defendant banks."

were altered so as to permit the accomplishment of this end.

In 1970, Georgia amended its banking statutes to allow *de jure* branching on a countywide basis. Because the city of Atlanta is contained within two counties, DeKalb and Fulton, which encompass the Atlanta suburbs in which the 5-percent banks operated, this change in the law meant that C&S National could now absorb the 5-percent banks as true branches. C&S consequently applied to the Federal Deposit Insurance Corporation (FDIC), under the Bank Merger Act of 1966, 80 Stat. 7, 12 U. S. C. § 1828, for permission to acquire all of the stock of six of the 5-percent banks historically operated by C&S as *de facto* branches. The FDIC authorized all but one of the proposed acquisitions.

The Justice Department immediately commenced this litigation in a Federal District Court for injunctive relief, alleging that the five acquisitions authorized by the FDIC would lessen competition in relevant banking markets, and thus violate § 7 of the Clayton Act, 38 Stat. 731, as amended, 64 Stat. 1125, 15 U. S. C. § 18, and that the historic *"de facto* branch" relations between C&S and the six 5-percent banks constituted unreasonable restraints of trade in violation of § 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1. After a trial, the court rendered judgment for C&S on all the issues. 372 F. Supp. 616. The Government appealed under § 2 of the Expediting Act, 32 Stat. 823, as amended, 15 U. S. C. § 29, and we noted probable jurisdiction.[2]

---

[2] 419 U. S. 893. Notice of appeal was filed prior to the effective date of the Antitrust Procedures and Penalties Act, Pub. L. 93–528, § 7, 88 Stat. 1710. The proposed acquisitions were stayed automatically by the filing of the suit, 12 U. S. C. § 1828 (c) (7) (A). The District Court continued the stay, and it has remained in force pending this decision.

## I. *The Background of This Litigation*

In applying the antitrust laws to banking, careful account must be taken of the pervasive federal and state regulation characteristic of the industry, "particularly the legal restraints on entry unique to this line of commerce." *United States* v. *Marine Bancorporation,* 418 U. S. 602, 606. This admonition has special force in the present case, for the *de facto* branch arrangements and the proposed acquisitions involved here were a direct response to Georgia's historic restrictions on branch banking.

Before 1927 Georgia permitted statewide branching, and C&S National, then as now headquartered in Savannah, established three branches in the city of Atlanta. In 1927, state law was changed to prohibit all branching.[3] C&S therefore decided to expand through the formation of a bank holding company. C&S Holding was founded in 1928, and between 1946 and 1954 this company purchased two banks, and founded a third, in the Atlanta area. But in 1956 Georgia again altered its statutes to prohibit a bank holding company from acquiring more than 15 percent of a bank's stock. Georgia Bank Holding Company Act, 1 Ga. Laws 1956, pp. 309–312. A 1960 amendment, still in force, reduced the maximum ownership level to 5 percent. Ga. Code Ann. 13–207 (a)(2) (1967 ed. and Supp. 1974).

By the 1950's, C&S National was interested primarily in suburban expansion. The Atlanta city limits had been frozen since 1952, and the area's economic and population growth consequently occurred primarily outside the city's boundaries. Between 1959 and 1969, C&S Holding accordingly established in the Atlanta suburbs (in DeKalb and Fulton Counties) the six 5-per-

---

[3] A 1929 amendment allowed branching within the home-office city of a bank, but this was of no aid to the ambitions of C&S National outside Savannah.

cent banks at issue in this case. Five of these banks were founded under the sponsorship of C&S; the sixth, the Tucker Bank, had long been an independent suburban bank when, in 1965, C&S converted it into a 5-percent bank.[4]

Each of these six banks was made a "correspondent associate" bank within the C&S system. This status involved many different relationships between the 5-percent bank and C&S: In addition to the 5-percent stock held by C&S Holding, substantial shares were also held by officers, shareholders, and friendly customers of other C&S banks, and by their family members. It was understood from the outset that the 5-percent banks would be acquired outright by C&S as soon as the law permitted. From at least 1965 on, the 5-percent banks used the C&S logogram on their buildings, papers, and correspondence. C&S filed the charter applications of the 5-percent banks

---

[4] Founded with C&S sponsorship were: (1) The Sandy Springs Bank, Fulton County (two offices). Founded in 1959 and operational in 1960 as the Citizens National Bank of Sandy Springs, it was converted in 1969 from a national to a state-chartered bank and adopted the name Citizens and Southern Bank of Sandy Springs. (2) The Chamblee Bank, DeKalb County. Founded in 1960 as the Chamblee National Bank, it was converted to a state-chartered bank in 1969 and adopted the name Citizens and Southern Bank of Chamblee. (3) The North Fulton Bank, Fulton County and North Fulton County. It was founded in 1967 as the Citizens and Southern Bank of North Fulton, a state-chartered institution. (4) The Park National Bank, DeKalb County. It was founded in 1967 as the Citizens and Southern Park National Bank. (5) The South DeKalb Bank, DeKalb County (two offices). It was founded as the Citizens and Southern South DeKalb Bank, a state-chartered institution, in 1969.

The Citizens and Southern Bank of Tucker (two offices), in DeKalb County, was independently founded in 1919, as the Bank of Tucker. C&S Holding acquired 5-percent ownership in 1965, and the bank then adopted its present name. This bank is involved in only the Sherman Act phase of this case. Its proposed acquisition by C&S was forbidden by the FDIC.

and openly assured the banks of full financial support, assurances which were often instrumental in securing regulatory approval of their creation. C&S chose the principal executive officer for each 5-percent bank. The employees of these banks were accorded the same pension and promotion rights in the C&S system as possessed by their colleagues at C&S National and its *de jure* affiliates. C&S selected the location of, and oversaw the selection of directors for, the suburban banks. A C&S executive served as an "advisory director" to each suburban bank. C&S conducted surprise audits and credit checks at the suburban banks. Each of the suburban banks provided the full panoply of C&S banking services, and customers of any 5-percent bank could avail themselves of these services at any of the other 5-percent banks, or at C&S National and its *de jure* branches. C&S supplied to each 5-percent bank, through manuals and memoranda, a large quantity of information concerning every conceivable banking procedure and problem. Included were data—stamped "for information only"—concerning interest rates and service charges employed by C&S National and its *de jure* branches, but each 5-percent bank was cautioned to use its own judgment in setting interest rates and service charges. In sum, it is fair to say—and the parties agree—that in almost every respect save corporate form, each of the 5-percent banks was a *de facto* branch of C&S National.

Between 1966 and 1968, the Federal Reserve Board investigated C&S's network of correspondent associate banks. The purpose of the investigation was to determine whether C&S was exerting such control over the 5-percent banks as to require special "approval" of the Federal Reserve Board pursuant to § 3 of the Bank Holding Company Act of 1956, as amended. 12 U. S. C. § 1842. The investigation ended in an "understanding" between the Board's staff and C&S that the "correspond-

ent associate" program, as the staff understood it, did not require formal approval.[5] The Justice Department participated in this investigation, and took no action of any kind inconsistent with this "understanding."

In 1970 Georgia amended its banking statutes to permit *de jure* branching within any county in which a bank already had an office. Ga. Code Ann. 13–203.1 (a) (Supp. 1974). This allowed C&S National to branch into those Atlanta suburbs which—like the city of Atlanta—are within the confines of DeKalb and Fulton Counties. C&S decided to convert the six 5-percent banks at issue here into *de jure* branches. C&S applied to the FDIC for permission to acquire all of the assets, and to assume all of the liabilities, of the 5-percent banks.[6] On October 4, 1971, after reviewing reports on the proposed acquisitions from the Federal Reserve Board, the Comptroller of the Currency, and the Justice Department, the FDIC approved C&S's acquisition of the five suburban banks which C&S had helped to found, but disapproved acquisition of the Tucker Bank. Because the Tucker Bank had enjoyed an independent existence before being converted into a 5-percent bank, the FDIC concluded that the correspondent associate affiliation there had been "anticompetitive in its origins" and should not be "ratified" by approval of out-

---

[5] See n. 17, *infra*. The investigation was concerned with § 3 of the Bank Holding Company Act of 1956, 70 Stat. 134, as amended on July 1, 1966, by Pub. L. 89–485, § 7, 80 Stat. 237, and on Dec. 31, 1970, by Pub. L. 91–607, Tit. I, § 102, 84 Stat. 1763. 12 U. S. C. § 1842.

[6] The acquisitions were to be made by bank subsidiaries of C&S Holding: C&S East Point, which proposed to acquire the Sandy Springs and North Fulton Banks, and C&S Emory, which proposed to acquire the Chamblee, Park National, South DeKalb, and Tucker Banks. The FDIC was the responsible federal agency because each of the acquiring banks is a "nonmember [of the Federal Reserve System] insured bank." 12 U. S. C. § 1828 (c) (2) (C).

right acquisition.[7] As for the five banks which C&S had helped to found, however, the FDIC stated:

> "[T]he opening of these . . . *de novo* banks served the convenience and needs of their respective communities and enhanced competition . . . ."

The FDIC noted that the C&S system was the largest commercial banking institution in Fulton County and in DeKalb County.[8] For this reason, it observed, "new acquisitions of nonaffiliated banks in the same market [by C&S] would raise the most serious competitive problems under the Bank Merger Act as amended and under Section 7 of the Clayton Act." But the FDIC reasoned that the acquisitions proposed by C&S did not raise such problems because the banks involved in the proposed mergers "do not compete today and never have competed"; further, there existed "no reasonable probability" that any of the 5-percent banks would break their ties with the C&S system even if the proposed acquisitions were disapproved. Thus, "[s]uch mergers would not alter the existing competitive structure . . . in any way or add to the concentration of banking resources now held by the C&S system."

## II. *The Suit in the District Court*

On November 2, 1971, within the 30-day period prescribed for such suits, 12 U. S. C. §§ 1828 (c)(6) and (7),

---

[7] The FDIC noted that the independent Tucker Bank had not been in unsound financial condition when C&S assumed *de facto* control in 1965, and that it would have been better for competition if C&S had instead sponsored a new bank in the community "just as it did in other growing sections of DeKalb County prior to the recent change in Georgia's branching laws."

[8] See the Appendix to this opinion for the District Court's statistical summary of the Atlanta area's banking markets, C&S's place in these markets, and the effect of the proposed acquisitions on the market-share statistics.

the United States filed a complaint in the District Court for the Northern District of Georgia, alleging that the five acquisitions approved by the FDIC would violate § 7 of the Clayton Act and that the ongoing correspondent associate relationships between C&S and the six 5-percent banks which it had originally sought to acquire constituted unreasonable restraints of trade, in violation of § 1 of the Sherman Act. The Government sought injunctive relief prohibiting the proposed acquisitions and terminating the alleged violations of the Sherman Act. On January 24, 1974, after an extensive trial, the District Court entered a judgment for the defendants. 372 F. Supp. 616, 643.

As to the Sherman Act allegations, the District Court based its judgment upon two separate and independent grounds. First, it held that the 1968 "understanding" between the staff of the Federal Reserve Board and C&S insulated the correspondent associate relationship between C&S and the 5-percent banks from attack under the antitrust laws. *Id.*, at 627. The court based this conclusion on the following statement in *Whitney Bank* v. *New Orleans Bank,* 379 U. S. 411, 419:

> "We believe Congress intended the statutory proceedings before the [Federal Reserve] Board to be the sole means by which questions as to the organization or operation of a new bank by a bank holding company may be tested."

Alternatively, assuming the Sherman Act applied, the District Court found that the United States had failed to prove that the correspondent associate relationships involved "collusive price fixing" or "any agreements not to compete or for market division." [9] The court held

---

[9] The court stated:

"The Government contends that the following aspects of the re-

"that the matters complained of are subject to the 'rule of reason,' [and] . . . the Government has not sustained its burden of proof as to the unreasonableness of the practices involved or with respect to any adverse impact upon competition." 372 F. Supp., at 627–628.

The Government had conceded that it was no violation of the Sherman Act for a large city bank to arrange a traditional "correspondent" relationship with a smaller,

---

lationships between the defendants have restrained interstate trade and commerce:

"1. The routine and systematic practice of furnishing to one another comprehensive information as to past, present and future competitive practices and policies ,with a purpose of achieving uniformity among the defendants;

"2. The provision by C&S National to the five percent defendants of various manuals and memoranda;

"3. The provision by C&S National to the five percent defendants of suggestions and advice on such matters as rates, hours of operation, types of loan to discourage and minimum loan rates . . . .

"The Government also asserts, and the record shows, that the advice and suggestions offered by C&S National are generally followed.

"These activities, however, do not amount to collusive price fixing. For example, there is no suggestion that any advice as to rates amounts to more than an expert appraisal of a market situation from the point of view of a lending institution—a type of opinion to which a lending institution would naturally be expected to pay great attention. . . .

"The practices involved here do not conform to the accepted definition or description of per se antitrust violations where no resort to context or circumstances is required (or permitted).

. . . . .

"There is no evidence of record to conclude that the utilization by the five percent defendant banks of the services or information received by them from C&S National or C&S Holding was a result of any tacit or explicit combinations rather than the natural deference of the recipient to information from one with greater expertise or better sources. In either case there is the flow of information as to rates, practices, etc., which the Government apparently applauds or at least condones in a correspondent banking relationship." 372 F. Supp., at 626, 627, and 628.

outlying bank—a " 'mutually beneficial arrangement whereby the smaller bank receives needed services and the larger bank obtains both the benefit of the correspondent bank balance kept with it and the income from the sale of its services to the smaller bank's customers.' " *Id.*, at 628. Noting this concession, the District Court observed:

"[S]uch assistance to, or sponsorship of, a smaller bank, is desirable and necessary and not anticompetitive. The difference between a pure correspondent relationship and a correspondent associate relationship as set forth in the evidence is merely one of degree, a fine line of demarcation almost impossible for the Court to perceive. . . .

". . . [T]he Court finds as a fact that the relationship between C&S National, C&S Holding, and the five percent defendant banks, and the interchange of information between them, have been reasonable under the circumstances and not in violation of Section 1 of the Sherman Act." *Ibid.*

Turning to the claim under § 7 of the Clayton Act, the court found that the various defendant banks were each "engaged in commerce" and that the relevant "line of commerce" was "commercial banking." The court declined, however, to define the appropriate geographic markets, stating that its "disposition of the case is based upon factors which make a precise delineation of the market area unnecessary." 372 F. Supp., at 629. Simply assuming the correctness of the Government's position that the appropriate markets were DeKalb County, Fulton County, North Fulton County, or the Atlanta area generally, the court made detailed findings as to the effect of the proposed acquisitions on C&S's nominal market shares. *Id.*, at 629–633.[10] But, just as had the FDIC

[10] See Appendix to this opinion.

before it, the court saw these increases in nominal shares as of no competitive significance because the 5-percent banks had always been *de facto* branches within the C&S system. *Id.*, at 633–638.[11]

[11] The court noted that "no witness (for either the Government or the defendants) testified that the proposed mergers would have any adverse economic or competitive implications whatever . . . ." 372 F. Supp., at 638. Competitors of the suburban 5-percent banks "expressed the view that the proposed mergers would have no effect whatsoever on competition as it relates to third parties." *Ibid.* The court found "as a fact that there is no presently existing substantial competition between the five percent defendant banks and C&S National, or *inter sese,* or with third parties, which would be affected by the proposed merger." *Id.*, at 642.

In the interval between the trial and the announcement of the District Court's opinion, the Supreme Court of Georgia had ruled in a separate suit brought by a group of independent suburban banks that C&S was in technical violation of the state bank holding company law with respect to the 5-percent banks in the Atlanta suburbs. Its judgment was grounded on the fact that, in addition to the 5-percent stock interest directly owned by C&S Holding, substantial numbers of shares were owned by C&S officers and directors. The state court accordingly directed the Georgia Banking Commissioner to file suit to force divestiture of excess stock holdings by these shareholders. *Independent Bankers Assn.* v. *Dunn,* 230 Ga. 345, 197 S. E. 2d 129, modified *sub nom. Citizens & Southern National Bank* v. *Independent Bankers Assn.,* 231 Ga. 421, 202 S. E. 2d 78. The District Court's opinion took notice of this state-court judgment and concluded that it would not lead to genuine competition among the 5-percent banks or between them and C&S. 372 F. Supp., at 643. After the District Court's opinion was announced, the State Banking Commissioner, acting pursuant to the state-court judgment, ordered C&S Holding to limit its direct and indirect interest in the stock of correspondent associate banks to 5 percent and ordered C&S to "terminate any direct or indirect supervision of the . . . five percent banks beyond that which is available from The Citizens and Southern National Bank or the Citizens and Southern Holding Company to any bank that wishes to enter into a correspondent relationship with such bank or holding company." On June 3, 1974, the District Court

III. *The Issues Under the Sherman and Clayton Acts*

It is common ground in this case that the 5-percent banks have been operated from the outset substantially as *de facto* branches of C&S, even though they are and have always been separate corporate entities. From these agreed-upon facts, the parties draw sharply divergent conclusions under the Sherman and Clayton Acts.

Section 1 of the Sherman Act, 15 U. S. C. § 1, provides:

> "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal . . . ."

The Government contends that the relationships between C&S and the six 5-percent banks constituted unreasonable restraints of trade on two alternative theories: (1) The relationships encompassed an agreement to fix interest rates and service charges among the 5-percent banks, and between these banks and C&S-owned banks, resulting in a *"per se"* violation of the Sherman Act (2) The programs unreasonably restrained interbank competition, as to prices and services, by extending interbank cooperation far beyond the conventional "correspondent" arrangements which large city banks traditionally make with small banks in outlying markets. C&S denies that its relationships with the 5-percent banks encompassed any agreements to fix prices and contends that the process of *de facto* branching was a procompetitive response to Georgia's anticompetitive ban on *de jure* branching, and thus legal under the Sher-

---

amended its opinion *nunc pro tunc* to find that the Banking Commissioner's "order does not change the underlying basis of the Court's decision that the proposed mergers will not substantially lessen competition." *Id.*, at 643 n. 8.

man Act's "rule of reason." In the alternative, C&S contends that its relationships with the 5-percent banks were subject to the "exclusive primary jurisdiction" of the Federal Reserve Board and thus immune from attack under § 1 of the Sherman Act. \

Section 7 of the Clayton Act, 15 U. S. C. § 18, provides:

> "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." [12]

The Government argues that the acquisitions of the five suburban banks approved by the FDIC would "lessen" competition when compared to what the situation would be if the defendant banks ceased their alleged

---

[12] Pursuant to 12 U. S. C. § 1828 (c)(7)(B), referring to 12 U. S. C. § 1828 (c)(5)(B), bank mergers are made subject to Clayton Act standards unless "the anticompetitive effects of the proposed transaction are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served." Hence, in bank merger cases brought under the Clayton Act, there is a " 'convenience and needs' defense" that "comes into play only after a district court has made a *de novo* determination of the status of a bank merger under the Clayton Act." *United States* v. *Marine Bancorporation,* 418 U. S. 602, 626. See also *United States* v. *Third National Bank in Nashville,* 390 U. S. 171; *United States* v. *First City National Bank of Houston,* 386 U. S. 361. Because of its disposition of the case, the District Court did not reach this additional defense which had been asserted by C&S.

violations of the Sherman Act. The Government further contends that, even if the present relationships between C&S and the 5-percent banks do not offend the Sherman Act, since the relationships might nevertheless change and the whole situation become more competitive for business or state-law reasons, the proposed acquisitions violate § 7 by foreclosing this possibility. C&S argues that the acquisitions would merely convert *de facto* into *de jure* branches, with no perceptible effect on competition compared with the present situation, which is asserted by C&S to be lawful under the Sherman Act. C&S urges that there is no realistic possibility of future competition among the defendant banks. In the alternative, C&S contends that each of the 5-percent banks operates in a distinct and segregable market, so that the proposed acquisitions would not lessen competition in any relevant "section of the country"; and that any anticompetitive effects of the acquisitions are "outweighed in the public interest" because the acquisitions meet "the convenience and needs" of banking customers in the Atlanta area.[13] The District Court did not reach these alternative contentions.

### A. *The Sherman Act Issues*

#### 1. *The Question of Immunity*

The District Court thought the correspondent associate programs immune from Sherman Act scrutiny because they were subject to the "exclusive primary jurisdiction" of the Federal Reserve Board under the Bank Holding Company Act of 1956, as amended. We do not so understand the law. The court relied on *Whitney Bank* v. *New Orleans Bank,* 379 U. S. 411, but the question in that case was the wholly different one of whether it is the Comptroller of the Currency or the

---

[13] See n. 12, *supra.*

Federal Reserve Board that has jurisdiction to determine whether transactions by a bank holding company conform with applicable state banking law. For guidance as to antitrust immunities, recourse must be had directly to the provisions of the Bank Holding Company Act, 12 U. S. C. § 1841 *et seq.*

The statutory scheme requires the "prior approval" of the Federal Reserve Board for certain transactions by bank holding companies—including transactions tending to create or enlarge holding company control of independent banks. 12 U. S. C. § 1842 (a).[14] The types of transactions requiring Board approval were expanded by amendments to the Act in 1966 and 1970.[15] Prior to

---

[14] "It shall be unlawful, except with the prior approval of the Board, (1) for any action to be taken that causes any company to become a bank holding company; (2) for any action to be taken that causes a bank to become a subsidiary of a bank holding company; (3) for any bank holding company to acquire direct or indirect ownership or control of any voting shares of any bank if, after such acquisition, such company will directly or indirectly own or control more than 5 per centum of the voting shares of such bank; (4) for any bank holding company or subsidiary thereof, other than a bank, to acquire all or substantially all of the assets of a bank; or (5) for any bank holding company to merge or consolidate with any other bank holding company. . . ." 12 U. S. C. § 1842 (a).

[15] Prior to the amendments of July 1, 1966, Pub. L. 89–485, § 7, 80 Stat. 237, prior approval of the Board was not required for causing a bank to become a subsidiary of a bank holding company. In addition to adding this requirement, the 1966 amendments broadened the definition of a subsidiary from a company in which a bank holding company "own[s]" 25 percent of the voting shares to a company in which a bank holding company "directly or indirectly own[s] or control[s]" this percentage share. Compare § 4 of the 1966 amendments, 80 Stat. 236, with § 2 (d) of the Bank Holding Company Act of 1956, 70 Stat. 133. The provision is now codified at 12 U. S. C. § 1841 (d)(1). The definition of subsidiary has also included, from the outset of the Act, "any company the election of a majority of whose directors is controlled in any manner" by

1966, it appeared that Board approval of a transaction provided no immunity from antitrust action, for a note then set out under 12 U. S. C. § 1841 stated that nothing in the Act was to be construed as a "defense" to an antitrust suit. The 1966 amendments to the Act formalized this provision, but also blunted its force by establishing an intricate procedure for accommodating the jurisdictions of the Board and the Justice Department.[16] Under

---

a bank holding company. 12 U. S. C. § 1841 (d) (2). The amendments of December 31, 1970, Pub. L. 91–607, § 101 (d), 84 Stat. 1763, further enlarged the definition of subsidiary to include "any company with respect to the management or policies of which such bank holding company has the power, directly or indirectly, to exercise a controlling influence, as determined by the Board, after notice and opportunity for hearing." 12 U. S. C. § 1841 (d) (3).

[16] § 11 of the 1966 amendments, Pub. L. 89–485, 80 Stat. 240. As presently in force, 12 U. S. C. § 1849, the provision (with subsection headings omitted) reads:

"(a) Nothing herein contained shall be interpreted or construed as approving any act, action, or conduct which is or has been or may be in violation of existing law, nor shall anything herein contained constitute a defense to any action, suit, or proceeding pending or hereafter instituted on account of any prohibited antitrust or monopolistic act, action, or conduct, except as specifically provided in this section.

"(b) The Board shall immediately notify the Attorney General of any approval by it pursuant to section 1842 of this title of a proposed acquisition, merger, or consolidation transaction, and such transaction may not be consummated before the thirtieth calendar day after the date of approval by the Board. Any action brought under the antitrust laws arising out of an acquisition, merger, or consolidation transaction approved under section 1842 of this title shall be commenced within such thirty-day period. The commencement of such an action shall stay the effectiveness of the Board's approval unless the court shall otherwise specifically order. In any such action, the court shall review de novo the issues presented. In any judicial proceeding attacking any acquisition, merger, or consolidation transaction approved pursuant to section 1842 of this title on the ground that such transaction alone and of itself constituted a violation of any antitrust laws other than sec-

the Act as amended, the Board "shall not approve" an otherwise forbidden transaction unless it meets certain antitrust standards derived from, but not everywhere identical to, the standards of the Sherman Act and of § 7 of the Clayton Act. 12 U. S. C. § 1842 (c). The Board's

tion 2 of Title 15, the standards applied by the court shall be identical with those that the Board is directed to apply under section 1842 of this title. Upon the consummation of an acquisition, merger, or consolidation transaction approved under section 1842 of this title in compliance with this chapter and after the termination of any antitrust litigation commenced within the period prescribed in this section, or upon the termination of such period if no such litigation is commenced therein, the transaction may not thereafter be attacked in any judicial proceeding on the ground that it alone and of itself constituted a violation of any antitrust laws other than section 2 of Title 15, but nothing in this chapter shall exempt any bank holding company involved in such a transaction from complying with the antitrust laws after the consummation of such transaction.

"(c) In any action brought under the antitrust laws arising out of any acquisition, merger, or consolidation transaction approved by the Board under section 1842 of this title, the Board and any State banking supervisory agency having jurisdiction within the State involved, may appear as a party of its own motion and as of right, and be represented by its counsel.

"(d) Any acquisition, merger, or consolidation of the kind described in section 1842 (a) of this title which was consummated at any time prior or subsequent to May 9, 1956, and as to which no litigation was initiated by the Attorney General prior to July 1, 1966, shall be conclusively presumed not to have been in violation of any antitrust laws other than section 2 of Title 15.

"(e) Any court having pending before it on or after July 1, 1966, any litigation initiated under the antitrust laws by the Attorney General with respect to any acquisition, merger, or consolidation of the kind described in section 1842 (a) of this title shall apply the substantive rule of law set forth in section 1842 of this title.

"(f) For the purposes of this section, the term 'antitrust laws' means the Act of July 2, 1890 (the Sherman Antitrust Act), the Act of October 15, 1914 (the Clayton Act), and any other Acts in pari materia."

order granting or denying an application for prior approval is subject to review in the courts of appeals. 12 U. S. C. § 1848. Furthermore, an approved transaction is stayed automatically for 30 days, during which time an antitrust suit challenging the transaction may be brought in the district court. 12 U. S. C. § 1849 (b). Such a suit is governed by the modified antitrust standards set out in § 1842 (c). If the antitrust suit is not brought within 30 days, and the transaction is consummated,

"the transaction may not thereafter be attacked in any judicial proceeding on the ground that it alone and of itself constituted a violation of any antitrust laws other than section 2 of Title 15 [§ 2 of the Sherman Act], but nothing in this chapter shall exempt any bank holding company involved in such a transaction from complying with the antitrust laws after the consummation of such transaction." 12 U. S. C. § 1849 (b).

C&S can draw no consolation from these provisions. It is true that the *staff* of the Federal Reserve Board, in 1968, came to an "understanding" with C&S that the correspondent associate programs then in effect did not offend § 3 of the Bank Holding Company Act, 12 U. S. C. § 1842 (a), and thus did not require formal Board "approval." [17] But this did not give rise to any

---

[17] The Secretary to the Federal Reserve Board described the investigation and the 1968 "understanding" in a 1972 letter to the Justice Department:

"The fact finding inquiry undertaken by Board staff into the relationship between Citizens & Southern and the other banking institutions referred to was begun in 1966 and continued into 1968. The principal focus of the inquiry concerned essentially two questions: (1) whether Citizens & Southern had unlawfully acquired a direct or indirect stock ownership in these banking institutions in excess of 5 per cent without first having secured the requisite prior Board approval; and (2) whether the banking institutions had un-

antitrust immunity. A consummated transaction acquires immunity under § 1849 (b) only when no antitrust action has been commenced within 30 days after

---

lawfully become subsidiaries of Citizens & Southern by virtue of the election of directors without first having received the requisite prior Board approval. The inquiry arose in 1966 out of information contained in Citizens & Southern's registration statement filed with the Board and in 1968 as a result of information supplied by the Comptroller of the Currency in connection with the merger of the Citizens and Southern National Bank and the Citizens and Southern Bank of Augusta. The inquiry referred to was not initiated as a result of any application filed with the Board for approval of an acquisition, merger, or consolidation transaction under section 3 of the Bank Holding Company Act.

. . . . .

"The Board of Governors did not issue any order approving the relationships between Citizens & Southern and the other banking institutions under section 3 of the Bank Holding Company Act.

. . . . .

"There was no determination made that approval of the Board under section 3 of the Bank Holding Company Act was required for Citizens & Southern to retain an ownership interest of 5 per cent or less in the banking institutions referred to or to maintain the relationships with those banks in circumstances where Citizens & Southern did not elect a majority of the directors of any such bank. There was an understanding reached between members of the Board's staff and representatives of Citizens & Southern that in those cases where Citizens & Southern purchased 5 per cent or less of the stock of a bank, in some instances furnishing a principal operating officer for such bank, as well as other employee benefits, Citizens & Southern would not be deemed to have control of a majority of the directors of such bank on these facts alone. Further, where the foregoing circumstances existed and where control of additional shares was purchased by the bank's executive officer, control of such shares purchased would not be attributed to Citizens & Southern so long as Citizens & Southern did not finance the purchase of such shares, directly or indirectly. Finally, it was understood that even though Citizens & Southern was responsible, directly or indirectly, in placing one or two directors on the boards of such banks, if that number did not constitute a majority of directors of

the transaction has received the "approval" of the *Board*, in an order which is subject to judicial review and which reflects application by the Board of the special antitrust standards of § 1842 (c). The immunity applies only to "an acquisition, merger, or consolidation transaction approved under section 1842 of this title in compliance with this chapter." § 1849 (b). The obvious purpose of the complex machinery in § 1849 (b) is to accord finality to formal actions of the Board not subjected to timely challenge under the antitrust laws. There is no indication that Congress wished to accord a similar finality to the informal views of the Board's staff.

We note, however, that the 1966 amendments also added a "grandfather" provision to the Bank Holding Company Act, 12 U. S. C. § 1849 (d):

> "Any acquisition, merger, or consolidation of the kind described in section 1842 (a) of this title which was consummated at any time prior or subsequent to May 9, 1956, and as to which no litigation was initiated by the Attorney General prior to July 1, 1966, shall be conclusively presumed not to have been in violation of any antitrust laws other than section 2 of Title 15 [§ 2 of the Sherman Act]."

Unlike § 1849 (b), this provision does not state or imply that the covered transactions must have received the formal approval of the Federal Reserve Board. This grandfather provision is not, like § 1849 (b), an attempt to accommodate the competing jurisdictions of the Federal Reserve Board under § 1842 and the Justice Department under the antitrust laws. Rather, the grandfather provision is a simple conferral of legislative amnesty for

---

such bank, the Board's staff would not consider that Citizens & Southern could reasonably be held to have control of a majority of the directors of such bank."

theretofore unchallenged transactions completed before Congress had clarified the nature of that accommodation.

The transactions by which C&S created a correspondent associate relationship with three of the 5-percent banks—the Sandy Springs, Chamblee, and Tucker banks—were consummated prior to July 1966, and the Attorney General had taken no action against those transactions by that date. Those transactions thus fall within the terms of the grandfather provision, and the correspondent associate programs in force at those three banks are, therefore, immune from attack under § 1 of the Sherman Act.

While the formation by C&S of a *de facto* branch was a unique type of transaction, it may fairly be characterized as an "acquisition, merger, or consolidation of the kind described in § 1842 (a)." Forming a *de facto* branch was a multifaceted operation—involving a multiplicity of purchases of stock by a number of parties, the adoption of the C&S logogram by the *de facto* branch, the connection of the *de facto* branch with C&S personnel and information programs, the structuring of the bank to receive and administer all C&S banking services, and the establishment of formal C&S influence over the board of directors at the *de facto* branch. But even before its scope was expanded in 1970, § 1842 (a) was concerned with more than the literal "acquisition" of stock: It took broad account of the "indirect" control of stock, and the control of boards of directors "in any manner," by bank holding companies.[18] The grandfather provision creates immunity under § 1 of the Sherman Act, not simply under § 7 of the Clayton Act, an indication that its protection extends not merely to literal acquisitions, mergers, and consolidations, but also to "restraints of trade" simultaneous with and function-

---

[18] See n. 15, *supra.*

ally integral to such transactions. Though multifaceted, the formation by C&S of a *de facto* branch was a unitary and cohesive undertaking in the sense that all the facets were closely coordinated, simultaneously instituted, and designed to serve the single purpose of fitting the new bank into the "C&S system." There is virtually nothing about the present correspondent associate programs that was not fully evident and in place from the moment the programs were launched. There has been no increase in C&S control, nor any change in the way it has been exercised.

Whether these programs violated § 1842 (a)—as it applies today or as it applied when the programs began—is not relevant to our inquiry.[19] By its terms, the grandfather provision applies to transactions *of the kind* described in § 1842 (a). We cannot believe that Congress wished to grant the benefits of the provision only to transactions that plainly *transgressed* § 1842 (a). Such a construction would make application of the grandfather provision not only cumbersome and time consuming,[20] but also flagrantly inequitable. The formation of a *de facto* C&S branch involved the direct and

---

[19] The grandfather provision creates a conclusive presumption of compliance with the antitrust laws, but not necessarily of compliance with the provisions of the Bank Holding Company Act. See 12 U. S. C. § 1849 (f).

[20] If the correspondent associate program had received formal Board approval, any antitrust immunity created by the machinery in § 1849 (b) could, of course, have extended only to those features of the program clearly and expressly encompassed by the approval order. But § 1849 (d) applies even where, as here, there has been no approval order. If the provision were construed to cover only transactions actually violative of § 1842 (a), a court applying the provision would face the daunting—and quite senseless—task of dissecting a complicated, integrated transaction, such as the formation of a *de facto* branch, into those components which did and those which did not require prior approval of the Board.

indirect acquisition of bank stock, and the direct and indirect assertion of control over the governance and operations of a bank, by a bank holding company. Though unusual in form, such a transaction quite clearly falls within the class of dealings by bank holding companies which Congress intended, in § 1849 (d), to shield from retroactive challenge under the antitrust laws.

### 2. *De Facto Branching Under the Sherman Act*

Three of the 5-percent banks—the Park National, South DeKalb, and North Fulton banks—were formed after July 1, 1966, and their correspondent associate relationships with C&S are therefore beyond the reach of the grandfather provision of the Bank Holding Company Act and subject to scrutiny under the Sherman Act.

Each of these banks was founded *ab initio* through the sponsorship of C&S. Except for that sponsorship, they would very probably not exist. The record shows that other banking organizations had been unsuccessful in attempting to launch new banks in the area, and C&S affiliation and financial backing were instrumental in convincing state and federal banking authorities to charter these new banks. In short, these banks represented a policy by C&S of *de facto* branching through the formation of new banking units, rather than through the acquisition, and consequent elimination, of pre-existing, independent banks.[21]

Of necessity, the Government's attack on this process

---

[21] The Tucker Bank, which was not founded as a new bank by C&S, comes within the coverage of the grandfather provision, as explained in the previous section. *De facto* branching through the *de facto* "acquisition" of pre-existing banks might raise questions under the Sherman Act considerably different from those presented by the C&S practice of *de facto* branching through founding *new* banks.

is highly technical. Had the new banks been *de jure* branches of C&S, the whole process would have been beyond reproach. Branching allows established banks to extend their services to new markets, thereby broadening the choices available to consumers in those markets.[22] Having access to parent-bank financial support, expert advice, and proved banking services, branches of several city banks can often enter a market not yet large or developed enough to support a variety of independent, unit banks. Branching thus offers competitive choice to markets where monopoly or oligopoly might otherwise prevail. Furthermore, the branching process gives to outlying customers the benefit of sophisticated services which local unit banks might have little ability or incentive to deliver. The Government denies none of this, nor that C&S's program of *de facto* branching was, until 1970, the closest substitute to *de jure* branching allowed under Georgia law. Yet the Government insists that this *de facto* branching violated the Sherman Act because the parent bank and its *de facto* branches were legally distinct corporate entities and were obligated, therefore, to compete vigorously against each other.

It is, of course, conceded that C&S's *de facto* branches have not behaved as active competitors with respect either to each other or to C&S National and its majority-owned affiliates. But the Government goes further and contends that the correspondent associate programs have actually encompassed at least a tacit agreement to fix interest rates and service charges, see *Interstate Circuit, Inc.* v. *United States*, 306 U. S. 208, 227; *United States* v. *Masonite Corp.*, 316 U. S. 265, 275–276; *United States* v. *Bausch & Lomb Optical Co.*, 321 U. S. 707, 723; *United States* v. *General Motors Corp.*, 384 U. S. 127,

---

[22] See generally M. Mayer, The Bankers 83–91 (1974).

142–143, so as to make the interrelationships—to that extent at least—illegal *"per se."* See *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 224–226, n. 59; *United States* v. *Parke, Davis & Co.,* 362 U. S. 29, 47. C&S vigorously denies the existence of any agreement to fix prices. The evidence in the record is mixed.

C&S did regularly notify the 5-percent banks—as it did its *de jure* branches—of the interest rates and service charges in force at C&S National and its affiliates. But the dissemination of price information is not itself a *per se* violation of the Sherman Act. See *Maple Flooring Assn.* v. *United States,* 268 U. S. 563; *Cement Mfrs. Protective Assn.* v. *United States,* 268 U. S. 588; *United States* v. *Container Corp.,* 393 U. S. 333, 338 (concurring opinion). A few of the memoranda distributed by C&S could be construed as advocating price uniformity; on the other hand, the memoranda were almost without exception stamped "for information only," and the 5-percent banks were admonished by C&S, several times and very clearly, to use their own judgment in setting prices; indeed, the banks were warned that the antitrust laws required no less. The District Court observed that in fact prices did not often vary significantly among the 5-percent banks or between these banks and C&S National, but the court attributed this to the "natural deference of the recipient to information from one with greater expertise or better services." 372 F. Supp., at 628. And the court found as a fact that there was no "collusive price fixing." *Id.,* at 626.

Were we dealing with independent competitors having no permissible reason for intimate and continuous cooperation and consultation as to almost every facet of doing business, the evidence adduced here might well preclude a finding that the parties were not engaged in a

conspiracy to affect prices. But, as we indicate below, the correspondent associate programs, as such, were permissible under the Sherman Act. In this unusual light, we cannot hold clearly erroneous the District Court's finding that the lack of significant price competition did not flow from a tacit agreement but instead was an indirect, unintentional, and formally discouraged result of the sharing of expertise and information which was at the heart of the correspondent associate programs. Fed. Rule Civ. Proc. 52 (a); *United States* v. *General Dynamics Corp.,* 415 U. S. 486, 508.

The Government argues, alternatively, that the correspondent associate programs have gone far beyond conventional "correspondent" relationships, and that consequently these programs have "unreasonably" restrained competition among the 5-percent banks and between these banks and C&S National. The District Court was not persuaded by this theory:

> "The difference between a pure correspondent relationship and a correspondent associate relationship as set forth in the evidence is merely one of degree, a fine line of demarcation almost impossible for the Court to perceive. . . . In either case there is the flow of information as to rates, practices, etc., which the Government apparently applauds or at least condones in a correspondent banking relationship." 372 F. Supp., at 628.

The court's dilemma is understandable, for in neither law nor banking custom has there developed a clear, fixed definition of the correspondent relationship: [23]

> "Correspondent banking is an interbank practice whereby 'city' correspondent banks provide a cluster

---

[23] Austin & Solomon, A New Antitrust Problem: Vertical Integration in Correspondent Banking, 122 U. Pa. L. Rev. 366, 367–368 (1973).

of services to smaller 'country' banks in exchange for interbank deposits. Dating back to colonial times, correspondent banking originally provided an extended network of independent unit banks with a link to financial centers, and at the same time furnished substitute central banking functions. Today, as a vital component of the era of electronic banking, it enables city correspondents to provide customers with a range of services that is varied, extensive and constantly expanding; one survey lists as many as fifty different categories."

Among the services typically provided within a conventional correspondent arrangement are check clearing, help with bill collections, participation in large loans, legal advice, help in building securities portfolios, counseling as to personnel policies, staff training, help in site selection, auditing, and the provision of electronic data processing. Furthermore, like C&S's program, the correspondent arrangement is often established as a prelude to a formal merger between the two banks.[24]

Nevertheless, C&S's program does appear to have gone several steps beyond conventional correspondent arrange-

---

[24] *Id.*, at 367–371. On the varieties of "service packages" to be found in correspondent banking, see also Knight, Correspondent Banking, Part I: Balances and Services, Fed. Reserve Bank of Kansas City Monthly Review (Nov. 1970); Knight, Correspondent Banking, Part II: Loan Participation and Fund Flows, Fed. Reserve Bank of Kansas City Monthly Review (Dec. 1970); Subcommittee on Domestic Finance of the House Committee on Banking and Currency, 88th Cong., 2d Sess., A Report on the Correspondent Banking System (Comm. Print Dec. 1964), and Correspondent Relations: A Survey of Banker Opinion (Comm. Print Oct. 1964); Nadler, Three Score Years of Correspondent Banking, Banking 54–55 (July 1968); Correspondent Banking Survey in Am. Banker 8–71 (Dec. 18, 1970).

ments. C&S has closely advised the boards of directors of the 5-percent banks, supplied their chief executive officers, allowed full "branchlike" use of the C&S logogram, provided all the C&S services available at a *de jure* branch, dealt with the 5-percent banks through the C&S branch administration department, and provided constant and detailed information on prices and on all banking procedures.[25] It is conceivable that these relationships, separately or taken together, have restrained competition among the defendant banks more thoroughly or effectively than would have a conventional correspondence program. But even if the Government had proved this, which the District Court found not to be the case, that alone would not make out a Sherman Act violation. C&S has operated the 5-percent banks as *de facto* branches as a direct response to Georgia's historic restrictions on *de jure* branching, and the question therefore remains whether restraints of trade integral to this particular, unusual function are unreasonable. See *Chicago Board of Trade* v. *United States,* 246 U. S. 231, 238. We turn directly to that question.

The central message of the Sherman Act is that a business entity must find new customers and higher profits through internal expansion—that is, by competing successfully rather than by arranging treaties with its competitors. This Court has held that even commonly owned firms must compete against each other, if they hold themselves out as distinct entities. "The corporate interrelationships of the conspirators . . . are not determinative of the applicability of the Sherman Act." *United States* v. *Yellow Cab Co.,* 332 U. S. 218, 227. See also *Kiefer-Stewart Co.* v. *Joseph E. Seagram & Sons,*

---

[25] Also, of course, C&S owns 5 percent of the stock in these banks—not a common facet of correspondent banking. But the Government neither challenges C&S's 5-percent ownership, as such, nor suggests that it aggravates the alleged antitrust problems.

*Inc.,* 340 U. S. 211, 215; *Timken Roller Bearing Co.* v. *United States,* 341 U. S. 593, 598; *Perma Life Mufflers, Inc.* v. *International Parts Corp.,* 392 U. S. 134, 141–142. *A fortiori,* independently owned firms cannot escape competing merely by pretending to common ownership or control, for the pretense would simply perfect the cartel. We may also assume, though the question is a new one, that a business entity generally cannot justify restraining trade between itself and an independently owned entity merely on the ground that it helped launch that entity, by providing expert advice or seed capital. Otherwise the technique of sponsorship followed by restraint might displace internal growth as the normal and legitimate technique of business expansion, with unknowable consequences.

But these general principles do not dispose of the present case. C&S was absolutely restrained by state law from reaching the suburban market through the preferred process of internal expansion. *De facto* branching was the closest available substitute.[26] Just last Term, in a brief presented to this Court, the Justice Department told us that it was desirable and procompetitive for a bank to "[enter] *de novo* into areas foreclosed to branching by sponsoring the organization of an affiliate bank, and later acquiring the bank. This method of expansion is legal and a well-recognized practice used by large statewide banking organizations, and recognized by the federal banking authorities."[27] The

---

[26] This case does not require us to explore the conceivable antitrust problems raised by correspondent banking in all circumstances and in all its many forms. We deal here solely with the founding and maintenance of new *de facto* branch banks in the context of a state ban on *de jure* branching.

[27] Brief for United States 15–16, filed in No. 73–38, O. T. 1973, *United States* v. *Marine Bancorporation* (citations to record omitted).

Government acknowledged that such a sponsored bank could "be affiliated with its sponsor for purposes of correspondent relationships and other inter-bank services, including financial support," and that it could be "formed" by the parent bank's "officers, directors, or their associates" and could be "assisted" by the parent firm "until acquired and converted into a branch." [28] This is as good a curbstone description as any of precisely the relationships at issue in the present case.[29]

To characterize these relationships as an unreasonable restraint of trade is to forget that their whole purpose and effect were to *defeat* a restraint of trade. Georgia's antibranching law amounted to a compulsory market division. Accomplished through private agreement, market division is a *per se* offense under the Sherman Act:

> "This Court has reiterated time and again that '[h]orizontal territorial limitations . . . are naked restraints of trade with no purpose except stifling of competition.'" *United States* v. *Topco Associates, Inc.,* 405 U. S. 596, 608, quoting *White Motor Co.* v. *United States,* 372 U. S. 253, 263.

The obvious purpose and effect of a rigid antibranching law are to make the potential bank customers of suburban, small town, and rural areas a captive market for small unit banks.[30] C&S devised a strategy to cir-

---

[28] *Id.,* at 16 and 17.

[29] The brief noted with approval an example where the sponsored bank had, according to state banking authorities, become a " 'satellite' " of the parent bank. *Id.,* at 16 n. 16.

[30] The banking business is, of course, riddled with state and federal regulatory barriers to entry. See *United States* v. *Marine Bancorporation,* 418 U. S., at 628–629. But most of these barriers— *e. g.,* chartering requirements—at least arguably serve the overriding public interest in maintaining customer confidence in the industry as a whole by assuring adequate financial stability and responsible management for all banks. Antibranching laws, on

cumvent this statutory barrier. By providing new banking options to suburban Atlanta customers, while eliminating no existing options, the *de facto* branching program of C&S has plainly been procompetitive.

The Government suggests that a "conventional" correspondent relationship between C&S and the 5-percent banks would have been equally procompetitive and would have had the added virtue of facilitating competition among the 5-percent banks and between them and C&S National. This is mere speculation on the present record. Moreover, it is far from clear that a conventional correspondent relationship would have allowed C&S to put its full range of services into the suburban market which, in light of the antibranching law, was the very point of its policy and program. Putting to one side the total lack of realism in suggesting that C&S might have founded new banks that would have competed vigorously with it and with each other, cf. *United States* v. *Penn-Olin Chemical Co.*, 378 U. S. 158, 169, the Government's argument wholly disregards C&S's ultimate goal of acquiring the new banks outright as soon as legally possible, a goal which the Government last year thought wholly proper. We hold that, in the face of the stringent state restrictions on

the other hand, are now widely recognized as a simple device to protect outlying unit banks from the rigors of regional competition. See Report, President's Commission on Financial Structure and Regulation 59–63, 113 (1971); Note, Bank Charter, Branching, Holding Company and Merger Laws: Competition Frustrated, 71 Yale L. J. 502, 515–516 (1962); Smith & Greenspun, Structural Limitations on Bank Competition, 32 Law & Contemp. Prob. 40, 45–46 (1967); Comment, Bank Branching in Washington: A Need for Reappraisal, 48 Wash. L. Rev. 611 (1973); Baker, State Branch Bank Barriers and Future Shock—Will the Walls Come Tumbling Down?, 91 Banking L. J. 119 (1974). See also *United States* v. *Marine Bancorporation, supra,* at 612 n. 8.

branching, C&S's program of founding new *de facto* branches, and maintaining them as such, did not infringe § 1 of the Sherman Act.

## B. *The Clayton Act Claim*

In the light of the previous discussion, disposition of the Clayton Act claim becomes relatively straightforward. The issue under § 7 of the Clayton Act is whether the effect of the proposed acquisitions, approved by the FDIC, "may be substantially to lessen competition . . . in any line of commerce in any section of the country."

The Government established that C&S is the predominant banking institution in DeKalb County, Fulton County, North Fulton County, and the Atlanta area generally; that in these markets the commercial banking industry is quite highly concentrated in terms of market share statistics; and, of course, that the proposed acquisitions would increase C&S's nominal market shares.[31] The District Court did not decide whether the geographic markets proposed by the Government were the appropriate ones. But assuming, *arguendo,* that they were, the Government plainly made out a prima facie case of a violation of § 7 under several decisions of this Court. See *United States* v. *Philadelphia National Bank,* 374 U. S. 321, 362–366; *United States* v. *Phillipsburg National Bank & Trust Co.,* 399 U. S. 350, 365–367; *United States* v. *General Dynamics Corp.,* 415 U. S., at 497. It was thus incumbent upon C&S to show that the market-share statistics gave an inaccurate account of the acquisitions' probable effects on competition. *United States* v. *General Dynamics Corp., supra,* at 497–498; *United States* v. *Marine Bancorporation,* 418 U. S., at 631. The District Court, like

---

[31] See Appendix to this opinion.

the FDIC before it, concluded that C&S had made the necessary showing that these proposed acquisitions would not "lessen" competition for the simple reason that under the correspondent associate program that had been continuously in effect, no real competition had developed or was likely to develop among the 5-percent banks, or between these and C&S National.

As to present and past competition, the Government agrees there is and has been none. If this state of affairs were the result of violations of the Sherman Act, we agree with the Government that making the evil permanent through acquisition or merger would offend the Clayton Act. See *Citizen Publishing Co.* v. *United States,* 394 U. S. 131, 135. But we have already concluded that C&S's program of founding and maintaining new *de facto* branches in the face of Georgia's anti-branching law did not violate the Sherman Act, and the *de facto* branches which C&S proposes to acquire were all founded *ab initio* with C&S sponsorship. It thus indisputably follows that the proposed acquisitions will extinguish no present competitive conduct or relationships. See *United States* v. *Trans Texas Bancorporation,* 412 U. S. 946, aff'g *per curiam* 1972 Trade Cas. ¶ 74,257 (WD Tex.).

As for future competition, neither the District Court nor the FDIC could find any realistic prospect that denial of these acquisitions would lead the defendant banks to compete against each other. The 5-percent banks theoretically *could* break their ties with C&S and its correspondent associate program, for these banks are each independently owned, but the record shows that none of the shareholders, directors, or officers of the 5-percent banks expressed any inclination to do so, and there was no evidence that the program has been other than beneficial and profitable for both C&S and the 5-

percent banks.[32] The Clayton Act is concerned with "probable" effects on competition, not with "ephemeral possibilities.". *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 323.

For the reasons set out in this opinion, the judgment of the District Court is affirmed.

*It is so ordered.*

## APPENDIX TO OPINION OF THE COURT

The District Court summarized the structure of various banking markets in the Atlanta area, and the statistical effects of the proposed acquisitions, in the following way, 372 F. Supp., at 629–632:

### DeKalb County

Treating C&S National, C&S Emory and C&S DeKalb as one banking organization, there are 19 commercial banking organizations operating offices in DeKalb

---

[32] In the entire history of C&S's 5-percent program, only the Stone Mountain Bank terminated its relationship with C&S. The record shows that that bank was not sponsored by C&S, that a large amount of the stock remained in the hands of a family hostile to C&S, that the bank's shareholders never intended to merge with C&S, and that the bank's board of directors resisted introduction of C&S banking methods. None of these factors exists with respect to the banks at issue in the present case.

It is true that C&S has recently been ordered by the State Banking Commissioner to trim back its percentage ownership of the suburban banks and to modify, in ways not yet fully clear, its "supervision" of those banks. See n. 11, *supra.* But the District Court considered this development and concluded that it would not lead to true competition among the defendant banks. The court explicitly found that the changes ordered would not affect the bonds of interbank consultation and cooperation which are at the heart of the correspondent associate program. 372 F. Supp., at 638, 643, and n. 8.

County. In terms of total deposits and total individual, partnership and corporation ("IPC") demand deposits held by all banking offices located in DeKalb County, the top 4 banks, respectively, are C&S (offices of C&S National in DeKalb County, C&S Emory and C&S De-Kalb), First National Bank of Atlanta, Trust Company of Georgia, and Fulton National Bank. In terms of outstanding loans, the top 4 banks are C&S (offices of C&S National in DeKalb County, C&S Emory and C&S DeKalb), Trust Company of Georgia, Tucker and Fulton National Bank. The shares of total deposits, total loans and total IPC demand deposits accounted for by the four largest banks are as follows:

| Banks | Total Deposits (12/31/71) | Total Loans (12/31/71) | IPC Demand Deposits (6/30/72) |
|---|---|---|---|
| Top 2................ | 38.3% | 42.7% | 34.8% |
| Top 3................ | 51.8% | 52.4% | 47.3% |
| Top 4................ | 62.9% | 61.8% | 58.2% |

C&S (offices of C&S National in DeKalb County, C&S Emory and C&S DeKalb) accounts for the following shares of total deposits, total loans and total IPC demand deposits held by all banking offices located in DeKalb County.

| Bank | Total Deposits (12/31/71) | Total Loans (12/31/71) | IPC Demand Deposits (6/30/72) |
|---|---|---|---|
| C&S ................ | 24.1% | 28.5% | 20.1% |

Chamblee, Park National and South DeKalb, all of whose banking offices are located in DeKalb County, account for the following shares of total deposits, total loans and total IPC demand deposits held by all banking offices located in DeKalb County:

| Banks | Total Deposits (12/31/71) | Total Loans (12/31/71) | IPC Demand Deposits (6/30/72) |
|---|---|---|---|
| Chamblee ............ | 5.7% | 5.7% | 5.9% |
| Park National........ | 2.9% | 1.5% | 3.0% |
| South DeKalb........ | 1.8% | 2.5% | 1.9% |
| | 10.4% | 9.7% | 10.8% |

Depending on the unit of measurement, Chamblee is the third or fourth largest bank headquartered in DeKalb County.

If the proposed mergers were approved, the C&S system (which would include offices of C&S National and South DeKalb) would account for 34.5% of the total deposits of all the banking offices located in DeKalb County, 38.2% of the total loans and 30.9% of the total IPC demand deposits. C&S would also be acquiring the third (or fourth) largest bank headquartered in De-Kalb County.

If the proposed mergers were approved, the four largest banks would account for the following shares of the DeKalb County market:

| Banks | Deposits | Total Loans | IPC Demand Deposits |
|---|---|---|---|
| Top 2 after mergers.. | 48.7% | 52.4% | 45.6% |
| Top 3 after mergers.. | 62.2% | 62.1% | 58.1% |
| Top 4 after mergers.. | 73.3% | 71.5% | 69.0% |

Thus, if the proposed mergers were approved, the C&S system's share of total deposits, for example, would increase from about 24% to 34%, or an increase of about 40%. The share of total deposits accounted for by the top 4 banks would increase from about 63% to 73%, while that of the top 2 and top 3 banks would increase from 38% to 49% and from 52% to 62%, respectively.

## North Fulton County

There are nine commercial banks operating offices in North Fulton County. In terms of total deposits and total IPC demand deposits held by all banking offices located in North Fulton County, the top 4 banks, respectively, are Sandy Springs, Roswell Bank, Fulton Exchange Bank and North Fulton. On June 30, 1970, however, there were only five banks operating offices in North Fulton County: the four banks just mentioned and Trust Company of Georgia Bank of Sandy Springs, which is now a branch of Trust Company of Georgia. The shares of total deposits and IPC demand deposits accounted for by the four largest banks are as follows:

| Banks | IPC Demand Deposits (6/30/72) | IPC Demand Deposits (6/30/70) | Total Deposits (6/30/70) |
|---|---|---|---|
| Top 2............... | 57.8% | 66.4% | 64.0% |
| Top 3............... | 70.1% | 78.9% | 80.2% |
| Top 4............... | 80.3% | 90.7% | 91.9% |

As of June 30, 1972, the North Springs Office of C&S East Point accounted for 1.7% of total IPC demand deposits held by all banking offices located in North Fulton County.

As of June 30, 1972, Sandy Springs and North Fulton accounted for 36.4% and 10.2%, respectively, of total IPC demand deposits held by all banking offices located in North Fulton County. As of June 30, 1970, they accounted for 34.4% and 11.7%, respectively, of total deposits held by all commercial banking offices located in North Fulton County.

If the proposed mergers were approved, the C&S system (which would include C&S East Point's North Springs Office, North Fulton and Sandy Springs) would

account for 48.3% of the total IPC demand deposits held by all commercial banking offices located in North Fulton County and the four largest banks would account for the following shares of IPC demand deposits in North Fulton County:

| Banks | IPC Demand Deposits |
|---|---|
| Top 2 after mergers | 69.7% |
| Top 3 after mergers | 82.0% |
| Top 4 after mergers | 92.0% |

Thus, if the proposed mergers were approved, the C&S system's [1] share of total IPC demand deposits held by all banking offices located in North Fulton County would increase from 1.7% to 48.3%, and the C&S system's share in this area would be twice that of the second largest banking organization, the Roswell Bank. Two of the four largest banks in the area would become part of the Atlanta area's largest banking organization. In addition, the share of total IPC demand deposits accounted for by the top 4 banks would increase from 80.3% to 92.0%, while the shares of the top 2 and top 3 banks would increase from 57.8% to 69.7% and from 70.1% to 82.0%, respectively.

## Fulton County

Treating C&S National and C&S East Point as one banking organization, there are 18 commercial banking organizations operating offices in Fulton County. In terms of total loans, deposits and IPC demand deposits held

---

[1] These computations consider the 5-percent defendant banks as completely separate entities (rather than as constituting a part of the C&S system as actually is the case), and of course, do not relate to competition as such but rather to the assignment of statistical proportions to the various entities involved.

by all banking offices located in Fulton County, the top 4 banks, respectively, are C&S (offices of C&S National in Fulton County and C&S East Point), First National Bank of Atlanta, Trust Company of Georgia and Fulton National Bank. The shares of total loans, deposits and IPC demand deposits accounted for by the four largest banks are as follows: [2]

| Banks | Total Loans (12/31/71) | Total Deposits (12/31/71) | IPC Demand Deposits (6/30/72) |
|---|---|---|---|
| Top 2 | 63.0% | 55.2% | 61.3% |
| Top 3 | 78.8% | 73.9% | 78.1% |
| Top 4 | 89.4% | 87.0% | 88.8% |

C&S (offices of C&S National in Fulton County and C&S East Point) accounts for the following shares of total loans, deposits and IPC demand deposits held by all banking offices located in Fulton County:

| Bank | Total Loans (12/31/71) | Total Deposits (12/31/71) | IPC Demand Deposits (6/30/72) |
|---|---|---|---|
| C&S | 37.2% | 30.8% | 32.1% |

Sandy Springs and North Fulton, both of whose banking offices are located in Fulton County, account for the following shares of total loans, deposits and IPC demand deposits held by all banking offices located in Fulton County:

| Banks | Total Loans (12/31/71) | Total Deposits (12/31/71) | IPC Demand Deposits (6/30/72) |
|---|---|---|---|
| Sandy Springs | .7% | .8% | .9% |
| North Fulton | .3% | .3% | .3% |
| | 1.0% | 1.1% | 1.2% |

2 See n. 1, *supra.*

Depending on the unit of measurement, Sandy Springs is the eighth or ninth largest banking organization in Fulton County.

If the proposed mergers were approved, the C&S system (which would include offices of C&S National in Fulton County, C&S East Point, Sandy Springs and North Fulton) would account for 38.2% of the total loans held by all banking offices in Fulton County, 31.9% of the total deposits and 33.3% of the total IPC demand deposits.

If the proposed mergers were approved, the four largest banks would account for the following shares in Fulton County:

| Banks | Total Loans | Total Deposits | IPC Demand Deposits |
|-------|-------------|----------------|---------------------|
| Top 2 after mergers.. | 64.0% | 56.3% | 62.5% |
| Top 3 after mergers.. | 79.8% | 75.0% | 79.3% |
| Top 4 after mergers.. | 90.4% | 88.1% | 90.0% |

### Atlanta Area

Treating C&S National, C&S Emory, C&S DeKalb and C&S East Point as one banking organization, there are 31 commercial banking organizations operating offices in the Atlanta area, six of which operate offices in both Fulton and DeKalb Counties. In terms of total loans, deposits, and IPC demand deposits held by all banking offices located in the Atlanta area, the top 4 banks, respectively, are C&S (offices of C&S National, C&S East Point, C&S Emory and C&S DeKalb), First National Bank of Atlanta, Trust Company of Georgia and Fulton National Bank. The shares of total loans, deposits and IPC demand deposits accounted for by the four largest banks are as follows:

| Banks | Total Loans (12/31/71) | Total Deposits (12/31/71) | IPC Demand Deposits (6/30/72) |
|---|---|---|---|
| Top 2............... | 60.5% | 53.2% | 58.0% |
| Top 3............... | 76.2% | 71.3% | 74.3% |
| Top 4............... | 86.7% | 84.2% | 85.0% |

C&S (offices of C&S National, C&S Emory, C&S East Point and C&S DeKalb) accounts for the following shares of total loans, deposits and IPC demand deposits held by all banking offices located in the Atlanta area:

| Bank | Total Loans (12/31/71) | Total Deposits (12/31/71) | IPC Demand Deposits (6/30/72) |
|---|---|---|---|
| C&S ............... | 36.4% | 30.0% | 30.6% |

Chamblee, Park National, South DeKalb, Sandy Springs and North Fulton account for the following shares of total loans deposits and IPC demand deposits held by all banking offices located in the Atlanta area:

| Banks | Total Loans (12/31/71) | Total Deposits (12/31/71) | IPC Demand Deposits (6/30/72) |
|---|---|---|---|
| Chamblee ............ | .5% | .6% | .8% |
| Park National........ | .1% | .3% | .4% |
| South DeKalb........ | .2% | .2% | .3% |
| Sandy Springs........ | .6% | .7% | .8% |
| North Fulton......... | .3% | .2% | .2% |
| | 1.7% | 2.0% | 2.5% |

If their deposits (as of 12/31/71) were combined ($71,142,252), these five banks would be the equivalent of the sixth largest banking organization in the Atlanta area. Sandy Springs and Chamblee are, alone, the tenth and eleventh largest banking organizations in the Atlanta area, respectively.

If the proposed mergers were approved, the C&S system (which would include the offices of C&S National in the Atlanta area, C&S Emory, C&S DeKalb, C&S East Point, Chamblee, Park National, South DeKalb, Sandy Springs and North Fulton) would account for 38.2% of the total loans held by all banking offices located in the Atlanta area, 32.0% of the total deposits and 33.0% of the total IPC demand deposits. C&S would also be acquiring the tenth and eleventh largest banks in the Atlanta area.

If the proposed mergers were approved, the four largest banks would account for the following shares in the Atlanta area:

| Banks | Total Loans | Total Deposits | IPC Demand Deposits |
|---|---|---|---|
| Top 2 after mergers.. | 62.2% | 55.2% | 60.5% |
| Top 3 after mergers.. | 77.9% | 73.3% | 76.8% |
| Top 4 after mergers.. | 88.4% | 86.2% | 87.5% |

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE WHITE join, dissenting.

I agree that the District Court erred in holding that the correspondent associate programs are immune from Sherman Act scrutiny because they are subject to the "exclusive primary jurisdiction" of the Federal Reserve Board under the Bank Holding Company Act of 1956, as amended. The District Court also erred, however, in holding that the United States did not prove the violations of § 1 of the Sherman Act, and § 7 of the Clayton Act, alleged, and I therefore dissent from the affirmance of its judgment.

The issues under the Clayton and Sherman Acts, while logically independent, are related; both present the question whether a large commercial bank, already possessing

a substantial share of the Atlanta market, may lawfully acquire other banks, rather than expand internally. Three banks now control more than 75% of the commercial banking business in Atlanta. Today's decision assures that their dominions will soon be extended as arrangements they have made with independent banks to operate as *"de facto* branches" are solidified through merger. I cannot agree with today's decision that the Government is powerless to prevent this result.

## I. *The Sherman Act*

The "5-percent" banks in this litigation entered into a relationship with C&S far exceeding that of "correspondent banking," the provision of check clearance, investment advice, personnel training, or other specialized services in arm's-length transactions.[1] From the very inception of these relationships, it was contemplated that

---

[1] Relationships labeled "correspondent banking" may call for careful scrutiny as the sale of specialized services by the corresponding bank shades into "consultation" by the correspondent on every business decision of significance. Correspondent banking, like other intra-industry interaction among firms or their top management, provides an opportunity both for the kind of education and sharing of expertise that ultimately enhances consumer welfare and for "understandings" that inhibit, if not foreclose, the rivalry that antitrust laws seek to promote. As one commentator on commercial banking practices has observed:

"[C]ommunication, especially when it comes from those at the top of a power hierarchy, tends to facilitate conflict resolution. Perhaps a great deal should not be made of this, but competition is a form of conflict and, in the present context, conflict resolution is a form of restraint on competition." Phillips, Competition, Confusion, and Commercial Banking, 19 J. of Finance 32, 42 (1964).

Since the relationship of C&S to the 5-percent banks goes well beyond ordinary "correspondent banking," this case does not present an occasion for further examination of the lawfulness of these more limited interconnections among firms.

the 5-percent banks would seek, and C&S would provide, advice and guidance with respect to virtually every business decision of significance. C&S provided advisory directors—treated by all parties as actual directors—made available operating manuals covering banking practices in minute detail,[2] and maintained a constant flow of bulletins whose contents ranged from admonitions about the antitrust laws to exhortations to "get the rates [on loans] up." C&S, through its Branch Supervision Department, monitored the performance of the management of the 5-percent banks and was instrumental in having replaced those who did not measure up. These arrangements had the desired effect. The elaborate fabric of "consultations," of seeking "advice and guidance," eliminated the opportunity for rivalry among the defendant banks. The District Court found "no presently existing substantial competition between the five-percent banks and C&S National, or *inter sese.*" 372 F. Supp. 616, 642 (1974).

## A

The Court concludes that antitrust scrutiny of the affiliation of three 5-percent banks is foreclosed by the grandfather provision of § 11 (d) of the Bank Holding Company Act, 12 U. S. C. § 1849 (d). That holding is plainly a distorted expansion of § 11 (d) beyond its language and purpose.

The concept of an amnesty for unchallenged structural arrangements in commercial banking first appeared

---

[2] The Consumer Credit Operating Bulletin, 7 App. E–1024 (DX–311), is illustrative. It explains what bank records should be established, the methods for arranging a repayment plan, and the procedures to be followed in perfecting a security interest. In addition, the manual sets forth C&S practice with respect to charges for late payments, extensions of repayment deadlines, and the notification of a borrower's employer about repayment delinquency.

in the 1966 amendments to the Bank Merger Act, 80 Stat. 7. In those amendments, Congress, responding in part to this Court's decisions in *United States* v. *Philadelphia National Bank,* 374 U. S. 321 (1963), and *United States* v. *First National Bank & Trust Co. of Lexington,* 376 U. S. 665 (1964), attempted to mesh antitrust considerations with review of proposed bank mergers by the appropriate regulatory agency. The resulting provisions, which mandate Justice Department participation in the regulatory approval process as well as consideration by the regulatory agencies of "competitive factors," and permit an antitrust suit within 30 days of regulatory approval, appear today in the Federal Deposit Insurance Act, 12 U. S. C. § 1828. See *United States* v. *First City National Bank of Houston,* 386 U. S. 361 (1967); *United States* v. *Third National Bank in Nashville,* 390 U. S. 171 (1968). The 1966 amendments also included a grandfather provision, 80 Stat. 10, that conferred immunity from antitrust challenge (except under § 2 of the Sherman Act) upon any "merger, consolidation, acquisition of assets, or assumption of liabilities" consummated before June 17, 1963, the date of the decision in *Philadelphia National Bank.*

A few months after enactment of the Bank Merger Act amendments, the "antitrust" provisions were written almost verbatim into the Bank Holding Company Act. Unlike their Merger Act counterparts, the 1966 amendments to the Bank Holding Company Act were not principally addressed to integrating antitrust standards with the regulatory process, but rather to expanding the Federal Reserve Board's jurisdiction and regulatory powers. The antitrust provisions of the Holding Company Act amendments received little legislative attention; the brief reference to them in the legislative history indicates that their pur-

pose was to "apply to bank holding company cases the same procedures as are now provided in bank merger cases . . . ."[3] Among the provisions so borrowed from the earlier Bank Merger Act amendments was the grandfather provision, § 11 (d).

Because of congressional preoccupation with the regulatory features of the 1966 amendments to the Bank Holding Company Act, interpretation of the antitrust provisions may involve as much an attribution of congressional intent as a discernment of it. This is particularly the case with respect to § 11 (d), which was transplanted from one regulatory statute to another with seemingly scant attention to the differences in the regulatory environment. Objections that grandfathering holding company acquisitions posed policy questions different from the retroactive immunization of mergers were quickly brushed aside,[4] and § 11 (d) was swept into law along with the other antitrust provisions. Thus, despite whatever dissimilarity of underlying policy considerations may have been exposed, Congress indicated that it considered the grandfather provisions in both statutes to advance substantially similar purposes. Accordingly, however difficult may be the discernment of the congressional intent expressed in § 11 (d), we must look for assistance to its counterpart in the Bank Merger Act, the only guidepost Congress has left us.

The grandfather provision of the Bank Merger Act amendments most assuredly did not provide sanctuary

---

[3] As initially enacted by the House, the amendments contained no antitrust provisions. See generally H. R. Rep. No. 534, 89th Cong., 1st Sess. (1965). These were added later by the Senate Banking and Currency Committee and subsequently adopted by both Houses. See S. Rep. No. 1179, 89th Cong., 2d Sess., 10 (1966).

[4] See letter from Deputy Attorney General Clark to Sen. Robertson, reprinted at 112 Cong. Rec. 12385 (1966), and accompanying remarks by Sen. Robertson, ibid.

for then-unchallenged price-fixing, market-division, or other cartel activity by banks. Congressional concern was much more narrowly directed. *Philadelphia National Bank* rejected a literal interpretation of § 7 of the Clayton Act that would have limited its application to stock acquisitions by banks, an interpretation that nevertheless enjoyed some acceptance prior to the decision. Congress was concerned about the difficulty of unscrambling pre-*Philadelphia National Bank* mergers undertaken in reliance upon the literal interpretation of § 7, which the Court ultimately rejected, and accordingly immunized them from suit under that section.[5] But a provision barring suit under § 1 of the Sherman Act was also necessary to safeguard the same mergers because of our decision in *Lexington Bank, supra.* Thus, although the resulting grandfather provision covered both the Clayton and Sherman Acts (except Sherman Act § 2), its purpose was to shield structural arrangements of the sort the Government challenged in *Philadelphia National Bank* and was continuing to challenge in the District Courts thereafter.[6]

Against the foregoing background, we confront the language of the counterpart in the Bank Holding Company Act. As enacted in 1966, § 11 (d) shielded an "acquisition, merger, or consolidation of the kind described in § 3 (a) of this Act." Section 3 (a) provided then, as today, that:

> "(a) It shall be unlawful, except with the prior

---

[5] See S. Rep. No. 299, 89th Cong., 1st Sess., 1–7 (1965); H. R. Rep. No. 1221, 89th Cong., 2d Sess., 4 (1966); 111 Cong. Rec. 13304–13305 (1965) (remarks of Sen. Robertson); 112 Cong. Rec. 2454 (1966) (remarks of Rep. Celler).

[6] See *United States* v. *Crocker-Anglo National Bank,* 223 F. Supp. 849 (ND Cal. 1963); *United States* v. *Manufacturers Hanover Trust Co.,* 240 F. Supp. 867 (SDNY 1965), cited in Hearings on S. 1698 before a Subcommittee of the Senate Committee on Banking and Currency, 89th Cong., 1st Sess., 446, 463 (1965).

approval of the Board, (1) for any action to be taken that causes any company to become a bank holding company; (2) for any action to be taken that causes a bank to become a subsidiary of a bank holding company; (3) for any bank holding company to acquire direct or indirect ownership or control of any voting shares of any bank if, after such acquisition, such company will directly or indirectly own or control more than 5 per centum of the voting shares of such bank; (4) for any bank holding company or subsidiary thereof, other than a bank, to acquire all or substantially all of the assets of a bank; or (5) for any bank holding company to merge or consolidate with any other bank holding company." [7]

Section 3 (a) is thus the operative provision of the statute permitting the Federal Reserve Board to regulate the events therein described.

By "grandfathering" an "acquisition, merger, or consolidation of the kind described in § 3 (a)," Congress obviously exempted from antitrust challenge only the events for which Board approval would have been required. None of the transactions defined by § 3 (a), however, includes those features of the "correspondent associate" relationship that the Government is challenging under Sherman Act § 1 in this case. Clauses (4) and (5) of § 3 (a) refer, respectively, to an acquisition of assets and a merger of two holding companies. Clause (3) refers to ownership of voting stock by a holding company; the stock ownership by C&S is not, however, the salient feature of the affiliative relationship and indeed is not challenged in this case. Clauses (1) and (2) address the creation of a holding company-subsidiary rela-

---

[7] Section 3 (a) had been in force since enactment of the Bank Holding Company Act in 1956. The 1966 amendment added clause (2) to its provisions.

tionship. The definitional provisions of § 2 (d) have undergone recent expansion, but in 1966 they designated a bank as a "subsidiary" if a holding company either (1) directly or indirectly owned or controlled 25% or more of its voting stock, or (2) controlled in any manner the election of a majority of its directors. These two conditions would often be satisfied simultaneously, and indeed shortly after enactment of the forerunner of this provision in 1956 it was suggested that the second condition was redundant. See Note, The Bank Holding Company Act of 1956, 9 Stan. L. Rev. 333, 337, and n. 59 (1957). Congress, however, was apparently concerned that stock interests could be so structured that a holding company could elect a majority of directors without satisfying the 25% ownership requirement.[8] Whether or not this fear was well-founded, it is clear that satisfaction of either condition required an arrangement whereby the holding company had the power to vote stock.

In establishing its "correspondent associates" C&S did not engage in the transactions described by § 3 (a) in 1966 and therefore sheltered by § 11 (d). Indeed, because of state-law restrictions C&S could not resort to the methods described by § 3 (a) of the Holding Company Act and turned instead to more informal arrangements, including "understandings." While the functional equivalent of a holding company-subsidiary relationship could perhaps be created through informal affiliation, § 3 (a), at least until quite recently, has been

---

[8] See H. R. Rep. No. 609, 84th Cong., 1st Sess., 12–13 (1955); 101 Cong. Rec. 8028 (1955) (remarks of Rep. Patman). In the form initially adopted by the House, the Act would have defined as a subsidiary a bank over which another company was found by the Federal Reserve Board to "exercise a controlling influence." The Senate amendment substituted the provision ultimately enacted, the requirement of control of the election of directors. See S. Rep. No. 1095, 84th Cong., 1st Sess., 5 (1955).

triggered by the formality of control of voting stock. To be sure, § 2 (d) has always referred to a subsidiary as one whose stock is "directly *or indirectly*" owned or controlled or whose election of directors is controlled *"in any manner"* by the holding company.[9] But there has been no suggestion by Congress, nor by the Board, that this language would embrace the less formal arrangements by which the C&S banks operated in complete harmony with C&S. Indeed, the statutory clues suggest the contrary, that Congress was concerned with powers attached to stock, and that "indirect" ownership or control merely referred to their exercise derivatively, through an intermediary.[10]

---

[9] The reference to indirect ownership, though contained in § 2 (a) of the 1956 Act (defining holding company), was inadvertently omitted from § 2 (d). See 70 Stat. 134. The 1966 amendments corrected the omission. See S. Rep. No. 1179, 89th Cong., 2d Sess., 8 (1966).

[10] Section 2 (g) of the Act defined indirect control or ownership:
"For the purposes of this Act—

"(1) shares owned or controlled by any subsidiary of a bank holding company shall be deemed to be indirectly owned or controlled by such bank holding company;

"(2) shares held or controlled directly or indirectly by trustees for the benefit of (A) a company, (B) the shareholders or members of a company, or (C) the employees (whether exclusively or not) of a company, shall be deemed to be controlled by such company; and

"(3) shares transferred after January 1, 1966, by any bank holding company (or by any company which, but for such transfer, would be a bank holding company) directly or indirectly to any transferee that is indebted to the transferor, or has one or more officers, directors, trustees, or beneficiaries in common with or subject to control by the transferor, shall be deemed to be indirectly owned or controlled by the transferor unless the Board, after opportunity for hearing, determines that the transferor is not in fact capable of controlling the transferee."

This provision was added by the 1966 amendments to adopt inter-

In the 1970 amendments to the Holding Company Act, 84 Stat. 1760, Congress expanded the reach of § 3. The Act now defines "control" to include a relationship whereby a company "directly or indirectly exercises a controlling influence over the management and policies of the bank . . . ." § 2 (a)(2)(C), 12 U. S. C. § 1841 (a) (2)(C). Congressional preoccupation with stock is still evident since there is a statutory presumption that "any company which directly or indirectly owns, controls, or has power to vote less than 5 per centum of any class of voting securities of a given bank or company does not have control over that bank or company." § 2 (a)(3). Nevertheless the Board has by regulation established a rebuttable presumption of control where a company

> "enters into any agreement or understanding with a bank . . . such as a management contract, pursuant to which the company or any of its subsidiaries exercises significant influence with respect to the general management or overall operations of the bank . . . ." 12 CFR § 225.2 (b)(3) (1975).

Arguably, the Board's interpretation would now bring within § 3 the affiliation of the 5-percent banks with C&S. But the Board's interpretation is based upon recent legislation expanding the reach of the Board's regulatory authority.[11] Since I do not suppose Congress intended in 1966 to immunize transactions of the kind it had not yet brought within § 3, the 1970 amendment is relevant only because it demonstrates the limited char-

---

pretations previously made by the Board. S. Rep. No. 1179, *supra*, at 8.

[11] Congress specifically noted the expansion. See S. Rep. No. 91–1084, p. 6 (1970); H. R. Rep. No. 91–1747, p. 12 (1970). See also Note, The Bank Holding Company Act Amendments of 1970, 39 Geo. Wash. L. Rev. 1200, 1213–1214 (1971).

acter of the transactions previously embraced by § 3 and "grandfathered" under § 11 (d).

The conclusion that Congress had traditionally not brought informal arrangements within § 3 (a) was reinforced by the provisions of § 4 (a)(2) of the original Act, 70 Stat. 135, which forbade a bank holding company to

> "engage in any business other than that of banking or of managing or controlling banks or of furnishing services to or performing services for any bank of which it owns or controls 25 per centum or more of the voting shares."

This provision was enacted in 1956, and as early as 1960 the Board by regulation interpreted "services" to include many of the functions C&S has performed for the 5-percent banks. Included in the Board's interpretation are: "(1) [e]stablishment and supervision of loaning policies; (2) direction of the purchase and sale of investment securities; (3) selection and training of officer personnel; (4) establishment and enforcement of operating policies; and (5) general supervision over all policies and practices." 12 CFR § 225.113 (1975). The differentiation of these activities from "control or management" and their inclusion in § 4 of the Act rather than in § 3 vividly exposes the fallacy of today's holding invoking § 11 (d) to foreclose scrutiny of the "correspondent associate" relationship of three of the 5-percent banks. Since § 11 (d) shielded only the events then described in § 3 (a), the conclusion is compelled that all the 5-percent banks are properly before us on the Sherman Act counts.[12] Accordingly, I turn to the merits.

___

[12] My conclusion that the affiliative relationships are not within the terms of § 3 (a), at least prior to the 1970 amendment, is further supported by the scope and outcome of the 1968 investigation of C&S undertaken by the Federal Reserve Board staff. The investigation was convened specifically to inquire into a possible violation

## B

The District Court found that there were no express agreements among the defendant banks to fix prices or divide markets that would call for application of the *per se* rule, *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150 (1940); *United States* v. *Sealy, Inc.,* 388 U. S. 350 (1967), but it also found that the effect of the association was to eliminate all competition among the banks involved.

The Court finds the restraints embodied in the "correspondent associate" relationship reasonable because of state-law restrictions that blocked, for a time, the avenue of internal expansion by C&S. If the question before us were the lawfulness of these arrangements at their inception, this solution might be satisfactory. The question would be a close one, however, calling for a delicate balancing of the immediate benefits of expanded banking services against the more distant, but nevertheless real, danger of permitting the restraints necessary to circumvent *de jure* barriers to expansion to continue longer than the conditions that justified them. The inquiry would, of course, have to take into account the possibility that expansion would occur under less restrictive conditions. New entry by an unaffiliated bank[13] or entry

---

of § 3. The staff was principally concerned with the pattern of ownership of the stock of the 5-percent banks, especially by C&S officers and employees. Ultimately the staff found this acceptable, so long as C&S did not finance the purchases. There is no indication, however, that the staff concerned itself with communications between C&S and the 5-percent banks with respect to such matters as interest rates, loan repayment policies, or other terms of business.

[13] There is little doubt that pent-up consumer demand for additional banks would sooner or later induce efforts to organize new ones. More questionable, however, is whether regulatory authorities would respond promptly to permit new entry. In general, reg-

with a more limited form of sponsorship—a period of initial assistance, followed by a withdrawal of the sponsor's influence, at least to a conventional correspondent relationship [14]—might have sufficed to provide the expansion cited here as a justification for incidental restraints. The judicial resources consumed by such an inquiry in any particular case would not be insubstantial, and the very difficulty of making such judgments has in many cases led us to prefer *per se* rules. *United States* v. *Socony-Vacuum Co., supra,* at 220–221; *Northern Pacific R. Co.* v. *United States,* 356 U. S. 1, 5 (1958); *United States* v. *Sealy, Inc., supra; United States* v. *Topco Associates, Inc.,* 405 U. S. 596 (1972). See also *United States* v. *Philadelphia National Bank,* 374 U. S., at 362.

The issue in this case, however, is not whether the affiliation of the 5-percent banks was lawful at its inception, but whether it could lawfully continue, for the Government sought only an injunction. By the time the Government brought suit, Georgia law per-

---

ulatory policy has been thought to retard formation of new banking institutions. See Peltzman, Entry in Commercial Banking, 8 J. Law & Econ. 11 (1965).

[14] The record demonstrates that such a chain of events is possible. Citizens & Southern Bank of Stone Mountain, organized in 1957 with C&S assistance, functioned as a correspondent associate from 1959 until 1970. At that time it declined an offer of acquisition by C&S and became independent of the C&S system. Appellees have argued that Stone Mountain represents a unique case because a majority of voting stock remained in the hands of a single family not intimately tied to the C&S system. This contention is not wholly supported by the record, since in his trial testimony Mr. Mills Lane, President of C&S from 1946 to 1970, referred to three other banks having a similar structure of ownership. (2 App. 378–379, referring to Pelham, Fayetteville, Hogansville). The example of Stone Mountain does, in any event, demonstrate that sponsorship can occur under conditions ultimately leading to independence of the sponsored institution.

mitted C&S to branch freely in the Atlanta suburbs. Because the rule of reason requires us to assess the lawfulness of a restraint in light of all the circumstances, *Chicago Board of Trade* v. *United States,* 246 U. S. 231, 238 (1918), the lawfulness of the practices at their inception, even if assumed, could not be controlling, for changes in market conditions can deprive once-reasonable arrangements of their justification. *United States* v. *Jerrold Electronics,* 187 F. Supp. 545, 560–561 (ED Pa. 1960), aff'd, 365 U. S. 567 (1961). See also *United States* v. *E. I. du Pont de Nemours & Co.,* 353 U. S. 586, 596–598 (1957). The claimed desirability of the challenged arrangements as a response to now-repealed restrictions of Georgia law is therefore relevant only insofar as it may also be claimed that continuation of such arrangements undisturbed by the Sherman Act would be vital to their creation were Georgia to reinstate its restrictions in the future. Put another way, we need concern ourselves with the lawfulness of *"de facto* branches" as a response to state-law restrictions only if appellees make a convincing showing that no bank would engage in *"de facto* branching" without a guarantee of perpetual noninterference from the antitrust laws.

Certainly it is open to C&S to argue that no rational banker would sponsor a *de facto* branch unless assured that the resulting relationships could continue in perpetuity. But this sort of argument has seldom carried the day in this Court, see *United States* v. *Sealy, supra; United States* v. *Topco Associates, supra,* and I do not find it persuasive in this case. A bank hemmed in by state antibranching restrictions will presumably find it profitable to take a small stock interest in an independent bank, to offer assistance and thereby attempt to win consumer loyalty through an expanded use of its own name. C&S presumably found these arrangements

profitable at their inception. The record does not show whether C&S actually charged the 5-percent banks for such assistance as site selection, economic surveys, equipment procurement, and other promotional services; there is no suggestion, however, that C&S provided these services at an ultimate loss, and presumably gains ultimately accrued to the provider. True, C&S hoped to cement the relationships through merger, but it is not clear that these expectations were essential to the initial undertaking. Indeed, C&S continued to provide assistance to certain banks as to which there was little prospect of ultimate acquisition by C&S. 2 App. 378–379. Our concern, in any event, lies not with protecting the expectations of C&S but with avoiding disincentives to the provision of desirable services. Sponsorship will be profitable to a sponsor bank assuming that there is a demand for the services of the sponsored bank and that the sponsor can recoup in some fashion a return for its assistance. These conditions should be sufficient to induce a profit-seeking bank, chafing under antibranching restrictions, to sponsor a new entrant even if permanent arrangements are forbidden.

This case, therefore, does not present an occasion for consideration whether the restraints incident to *"de facto* branching" are lawful when undertaken in response to a prohibition of *de jure* branching, a position the Court says the Government took last Term in *United States* v. *Marine Bancorporation,* 418 U. S. 602 (1974). The restraints incident to the affiliation of the 5-percent banks with C&S must be examined in light of conditions prevailing at the time of suit, which include the ability of C&S to branch freely in the Atlanta suburbs.

The arrangements between C&S and the 5-percent banks resemble a "common brand" marketing agreement or a franchising arrangement in which the franchisor

itself deals directly with consumers as well as providing entrepreneurial skill and other assistance to franchisees. Such combinations may, under certain circumstances, enhance competition. Common-brand marketing may permit a group of small firms to exploit promotional economies and thereby compete with larger enterprises whose business spans several geographic submarkets. Franchising may facilitate entry by allowing an entering firm to save on promotional expenses and to purchase needed entrepreneurial assistance. Restraints invariably accompany these combinations for the purpose of promoting product uniformity, for some standardization of product is indispensable to the success of the scheme. Because notwithstanding accompanying restraints such combinations may on balance enhance competition, it would be a mistake to regard them as *per se* or even presumptively unlawful, and lower courts have not done so. See, *e. g., United States* v. *Topco Associates, Inc.,* 319 F. Supp. 1031, 1038 (ND Ill. 1970), rev'd on other grounds, 405 U. S. 596 (1972); *Siegel* v. *Chicken Delight, Inc.,* 448 F. 2d 43 (CA9 1971); *Susser* v. *Carvel Corp.,* 332 F. 2d 505 (CA2 1964). But the Sherman Act limits the scope of cooperation incident to such arrangements. The participants may not fix prices or divide markets. *United States* v. *Topco Associates, Inc., supra; United States* v. *Sealy, Inc., supra; United States* v. *Arnold, Schwinn & Co.,* 388 U. S. 365 (1967). Such combinations, moreover, warrant careful scrutiny when their participants collectively possess a dominant share of a common market, as to which there are substantial barriers to entry, for these conditions enhance the profitability of price collusion among participants and thus may tempt them to standarize price as well as other product attributes.

Despite the acceptability generally of common-brand

or franchising arrangements, they pose particular difficulty in the commercial banking context. Many features of a commercial bank's services are set by regulation, thus inhibiting competition by restricting the number of product features that individual firms are free to vary. With interest rates on loans fixed by law, for example, competition is confined to such "non-price" features as collateral requirements or repayment policies. With competition thus already delimited, few additional restraints incident to a cooperative scheme can be tolerated before competition is extinguished entirely. Moreover, the entry barriers posed by regulation enhance the danger that incidental cooperation will be extended to abolish all rivalry. These considerations suggest that cooperative arrangements in commercial banking should be permitted only where their competitive benefits are clear, and where the combined market shares of the participants dispel the fear that price collusion will accompany them.

The situation here fails to satisfy the test. The combined shares of C&S and the 5-percent banks are substantial under any of the alternative definitions of the geographic market cited by the Court. *Ante,* at 122–130.[15] Furthermore, the cooperative arrangements in-

---

[15] The District Court made no finding as to the relevant geographic market, accepting the Government's contentions *arguendo* in deciding the case. The Court apparently does the same. A report prepared by the Government's expert witness concluded that while the Atlanta Standard Metropolitan Statistical Area was too large to be considered an integral geographic market, the constituent counties of DeKalb and Fulton were "reasonable geographic areas within which it is appropriate to analyze the competitive effects of the proposed mergers." 4 App. E–83. This is an approximation, of course, since the same report revealed that a number of DeKalb residents use Fulton County banks, thus suggesting that in certain respects DeKalb and Fulton County banks compete for the same business. Accordingly, it appears that defining the geographic mar-

volve not a group of small firms allied to challenge a larger rival, *United States* v. *Topco Associates, supra,* but instead the dominant firm which thereby extends its hegemony. In a market so concentrated as is commercial banking in Atlanta, the most must be made of opportunity for rivalry among existing firms. Cf. *United States* v. *Philadelphia National Bank,* 374 U. S., at 372. The 5-percent banks are now substantial, thriving enterprises,[16] inhibited from competing with C&S only by the "correspondent associate" relationship. I would hold that the Government is entitled to an injunction, specifically against the continued use by the 5-percent banks of the C&S name, the continued use of advisory directors furnished by C&S, and continued "consultations" between the management of the 5-percent banks and C&S, including the flow of memoranda for "advice and guidance."

## II. *The Clayton Act*

The Court concedes that under our prior decisions the Government has established a prima facie case under § 7. *Ante,* at 120. But the Court affirms the District Court's determination that the acquisitions add nothing

---

ket to include both DeKalb and Fulton Counties would be justified under our cases. See *United States* v. *Phillipsburg National Bank & Trust Co.,* 399 U. S. 350 (1970); *United States* v. *Philadelphia National Bank,* 374 U. S. 321 (1963).

[16] Three of the 5-percent banks—Sandy Springs, Chamblee, and Tucker—had deposits exceeding $15 million as of January 1, 1970. North Fulton, Park National, and South DeKalb were smaller and more recently organized, but all have experienced vigorous growth. The average annual rate of deposit growth for the two years preceding January 1, 1970, was 102% for North Fulton and 50% for Park National, in contrast to a national average rate for all commercial bank deposits during the same period of slightly more than 10%. South DeKalb, organized in late 1969, had more than doubled its deposits from $1.5 to $3 million during the first half of 1970. 5 App. E–422, E–546.

of anticompetitive significance to the pre-existing "correspondent associate" relationship. Since I have concluded that the relationship itself violates the Sherman Act, I also disagree with the Court's affirmance of the District Court on the Clayton Act issue. Since, in my view, appellees can no longer rely upon the affiliation to rebut the Government's prima facie case, I would remand to the District Court for consideration of the "convenience and needs" defense of 12 U. S. C. § 1828 (c)(5)(B). But I also disagree with the Court's conclusion that the acquisitions add nothing of significance to the existing arrangements, and I would therefore reverse even if I accepted the Court's disposition of the Sherman Act counts. I state briefly my reasons for so concluding.

If not acquired, the 5-percent banks have the power to break their ties with C&S, and the likelihood that any would do so may be expected to increase as the demand for their services grows and as their managements acquire additional business experience. However risky these ventures may have been at their inception, the recent performance of the 5-percent banks attests to their present viability.[17] Because of the continuing population growth of the Atlanta area, the banks may anticipate an expanding demand for their services. These circumstances might well induce the management of a 5-percent bank to assume a more independent posture, at least to shop around among other large Atlanta banks for more conventional "correspondent" services.[18]

---

[17] See n. 16, *supra*.

[18] Officers of both C&S and the 5-percent banks testified that they had not contemplated a severance of relations, but this testimony does not establish what would happen if the acquisitions were enjoined. Had the managements testified that they would not consider severance under any circumstances, such declarations of an intention to eschew a course dictated by economic self-interest would have to be viewed with skepticism. See *United States* v. *Falstaff*

Quite apart from what the managements of the 5-percent banks might do, it is most improbable that C&S would long be happy with existing arrangements if acquisition were enjoined. The record demonstrates the aggressive, expansionist performance of C&S, having increased its Atlanta offices from three in 1946 to more than 100 by the time of trial. It is quite inconceivable that such a firm would long be content to continue operations through *de facto* branches in which its interest was limited to 5%. The formation of *de jure* branches, ultimately in competition with former "correspondent associates," would be a plausible result.

The foregoing are not "ephemeral possibilities," *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 323 (1962), that antitrust analysis should ignore. Section 7 was intended, as we have repeatedly said, to "arrest anticompetitive tendencies in their 'incipiency.'" *United States* v. *Philadelphia National Bank,* 374 U. S., at 362. In applying the § 7 standards, we are obliged to hold acquisitions unlawful if a reasonable likelihood of a substantial lessening of competition under future conditions is discernible. *E. g., United States* v. *Continental Can Co.,* 378 U. S. 441, 458 (1964); *FTC* v. *Procter & Gamble Co.,* 386 U. S. 568, 577 (1967); *United States* v. *Falstaff Brewing Corp.,* 410 U. S. 526, 539 (1973) (DOUGLAS, J., concurring in part). While inquiry as to future market conditions and performance inevitably involves speculation, fidelity to the

---

*Brewing Corp.,* 410 U. S. 526, 568–570 (1973) (MARSHALL, J., concurring in result).

Whether the 5-percent banks would have been formed at all had their principals expected the Clayton Act to bar ultimate acquisition by C&S is a different question. I am not troubled by it for essentially the same reasons that have led me to conclude above that enjoining continuation of correspondent associate relationships would not deter sponsorship of *de facto* branches under state-law restrictions on *de jure* branching. See *supra,* at 143–144.

congressional purpose requires us to resolve reasonable doubts in favor of the preservation of independent entities. This is perforce true where, as here, the market is highly concentrated and the acquiring firm is the dominant one.

My Brother WHITE reminded us in his dissent last Term in *United States* v. *Marine Bancorporation,* 418 U. S., at 653:

> "In the last analysis, one's view of this case, and the rules one devises for assessing whether this merger should be barred, turns on the policy of § 7 of the Clayton Act to bar mergers which may contribute to further concentration in the structure of American business. . . . The dangers of concentration are particularly acute in the banking business, since 'if the costs of banking services and credit are allowed to become excessive by the absence of competitive pressures, virtually all costs, in our credit economy, will be affected. . . .' " (Citations omitted.)

Today's decision permits C&S, the dominant commercial bank in Atlanta, further to entrench its position. Two other rivals, which together with C&S control more than 75% of the banking business in Atlanta, may now be expected to follow suit, acquiring their own *"de facto* branches." [19] I believe these developments exemplify the "further concentration in the structure of American business" that § 7 was designed to prevent. Accordingly, I would reverse the judgment of the District Court.

---

[19] The record indicates that at the time C&S applied for regulatory approval of the acquisitions, its two largest competitors, First National Bank of Atlanta and Trust Company of Georgia, had sought and in some cases had obtained, approval for similar acquisitions of affiliated banks. 1 App. E–39.