Niners, Ltd., The Seattle Professional Football Club, Tampa Bay Area NFL Football, Inc., Pro–Football, Inc., National Football League, and the National Football League Management Council, Plaintiffs,

v.

## NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, Defendant.

Civ. No. 4–90–261.

United States District Court, D. Minnesota, Fourth Division.

March 30, 1992.

The FIVE SMITHS, INC., Buffalo Bills, Inc., Chicago Bears Football Club, Inc., Cincinnati Bengals, Inc., Cleveland Browns, Inc., The Dallas Cowboys Football Club, Ltd., PDB Sports, Ltd., The Detroit Lions, Inc., Green Bay Packers, Inc., Houston Oilers, Inc., Indianapolis Colts, Inc., Kansas City Chiefs Football Club, Inc., The Los Angeles Raiders, Ltd., Los Angeles Rams Football Company, Inc., Miami Dolphins, Ltd., Minnesota Vikings Football Club, Inc., KMS Patriots LP, The New Orleans Saints Limited Partnership, New York Football Giants, Inc., New York Jets Football Club, Inc., The Philadelphia Eagles Football Club, Inc., B & B Holdings, Inc., Pittsburgh Steelers Sports, Inc., The Chargers Football Company, The San Francisco Forty-

Patrick J. Schiltz, W. James Fitzmaurice, Faegre & Benson, Minneapolis, Minn., John H. Schafer, Herbert Dym, Neil K. Roman, Covington & Burling, Washington, D.C., Bobby R. Burchfield, Jeffrey Pash, Frank Rothman, Douglas B. Adler, Skadden, Arps, Slate, Meagher & Flom, Los Angeles, Cal., Shepard Goldfein, Skadden, Arps, Slate, Meagher & Flom, New York City, for plaintiffs.

Luke H. Terhaar, Carol T. Rieger, Charles Joseph Lloyd, Edward Michael Glennon, Lindquist & Vennum, Minneapolis, Minn., Jeffrey L. Kessler, James W. Quinn, Weil, Gotshal & Manges, New York City, for defendant.

## ORDER

DOTY, District Judge.

This matter is before the court on defendant National Football League Players Association's ("NFLPA") motion to dismiss Count IV of plaintiffs' amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Based on a review of the file, record, and proceedings herein, the court grants defendant's motion.

## BACKGROUND

In Count IV of the amended complaint,[1] plaintiffs, the National Football League and its twenty-eight member clubs, allege that:

> [d]efendant has engaged, and continues to engage, in a combination and conspiracy with agents representing NFL players ("player-agents"), the purpose and effect of which is to fix, raise and/or maintain compensation paid to NFL players.

(Amended Compl. ¶ 73). They assert that defendant's "conspiratorial activities constitute per se violations ... and/or unreasonable restraints of trade" under section 1 of the Sherman Act, 15 U.S.C. § 1. (*Id.* ¶ 72). Defendant moves to dismiss Count IV under both theories. It contends that plain-

---

1. This court previously dismissed Counts I, II and III of plaintiffs' complaint. *Five Smiths,* *Inc. v. National Football League Players Ass'n,* No. 4-90-261 (D.Minn. June 27, 1991).

tiffs' claim fails under the per se rule because its factual underpinnings are either too vague to state a claim, fail to allege the requisite concerted action or allege a conspiracy that does not constitute a per se antitrust violation. Defendant further argues that plaintiffs' claim fails under the rule of reason because the amended complaint does not allege any injury to competition and does not set forth the relevant market in which any such injury occurred. Defendant finally urges the court to dismiss plaintiffs' claim with prejudice and without leave to amend the complaint because plaintiffs can prove no set of facts on which relief may be granted.

Plaintiffs respond that the allegations in Count IV are specific enough to withstand a motion to dismiss. They also contend that the NFLPA's agreement to exchange price information with agents is a per se antitrust violation because it indicates the existence of a broader conspiracy to fix, raise, stabilize or maintain prices, that is, players' salaries. They further contend that the salary exchange constitutes a rule of reason violation because it has the anti-competitive effect of forcing them to pay higher player salaries that they would otherwise have to pay in the absence of such an exchange. Plaintiffs thus argue that defendant's motion to dismiss must be denied.

## DISCUSSION

On a motion to dismiss for failure to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must construe the complaint in the light most favorable to plaintiffs and the complaint's allegations must be accepted as true. *Cooper v. Pate*, 378 U.S. 546, 546, 84 S.Ct. 1733, 1733, 12 L.Ed.2d 1030 (1964) (per curiam). Thus, "the court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104

S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)). With that standard at hand, the court will consider defendant's motion to dismiss plaintiffs' antitrust claim under both theories.

### 1. The Per Se Rule

 In order to prove a violation of section 1 of the Sherman Act, a plaintiff must establish the existence of a contract, combination or conspiracy that unreasonably restrains trade. 15 U.S.C. § 1; *Standard Oil Co. v. United States*, 221 U.S. 1, 60, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911) (adding requirement that restraints must be unreasonable to violate section 1). Two methods of analysis are used to determine whether a particular concerted action violates section 1: the per se rule and the rule of reason.[2] Courts apply the rule of reason to:

> agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed.

*National Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). The per se rule is limited to certain categories of agreements that are so plainly anticompetitive and lacking in redeeming virtue that they are conclusively presumed to be illegal without elaborate inquiry into the precise harm that they have caused or their business justification. *See, e.g., Northern Pac. Ry. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); *Stifel, Nicolaus & Co. v. Dain, Kalman & Quail, Inc.*, 578 F.2d 1256, 1259 (8th Cir.1978). A plaintiff's attachment of a per se label, however, is inadequate to sustain a complaint; the court must scrutinize the alleged activity to determine whether such a characterization is appropriate. *E.g., Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d

**2.** *See generally* Thomas A. Piraino, Jr., *Reconciling the Per Se and Rule of Reason Approaches to Antitrust Analysis*, 64 S.Cal.L.Rev. 685 (1991) (discussing difficulty in determining which approach should apply and arguing that courts should analyze section 1 conduct on a continuum).

1101, 1108 (7th Cir.1984) (citing *Bunker Ramo Corp. v. United Business Forms,* 713 F.2d 1272, 1284 (7th Cir.1983)), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985). Plaintiffs purport to assert a per se theory of liability in Count IV of the amended complaint. The court will therefore examine the specific factual allegations in the complaint to determine whether they are sufficient to support a per se violation.

■ Plaintiffs' complaint contains one specific factual allegation of concerted action, that is:

> the player-agents, with the approval and assistance of the NFLPA, have regularly exchanged compensation information and information about current offers among themselves, in furtherance of the NFLPA's unlawful activity.

(Amended Compl. ¶ 75). Plaintiffs thus allege that player-agents acted in concert with the NFLPA in the collection and dissemination of information concerning player compensation.[3] That allegation alone, however, is insufficient to support a per se violation of the Sherman Act. The court first concludes that any exchange of salary information between players or their agents should not be subject to the per se rule because such an exchange occurs in an environment where most players are not able to compete for the same jobs on the same teams. In *National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Oklahoma,* the Supreme Court stated that:

> Per se rules are invoked when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct. But whether the ultimate finding is the product of a presumption, or actual market analysis, the essential inquiry remains the same— whether or not the challenged restraint enhances competition.

468 U.S. 85, 103–04, 104 S.Ct. 2948, 2961, 82 L.Ed.2d 70 (1984) (footnotes omitted). The Supreme Court further acknowledged that even:

> Per se rules may require considerable inquiry into market conditions before the evidence justifies a presumption of anti-competitive conduct.

*Id.* at 104 n. 26, 104 S.Ct. at 2961–62 n. 26. Examining the current structure of the National Football League, the court notes that under plaintiffs' annual college draft, virtually the entire supply of new players are apportioned amongst the clubs, with each team being assigned the exclusive rights to bargain with their draft picks. Thus, a player who is drafted by a given team cannot compete with other players for a position on another team. *Smith v. Pro Football, Inc.,* 593 F.2d 1173, 1185–86 (D.C.Cir.1978) (affirming district court's determination that the college draft "leaves no room whatever for competition among teams for the services of college players, and utterly strips them of any measure of control over the marketing of their talents" (quoting *Smith v. Pro Football, Inc.,* 420 F.Supp. 738, 746 (D.D.C.1976)). Moreover, once players sign contracts with their respective teams, the first refusal/compensation rule has the practical effect of preventing veteran players from outside the team from competing with veteran players on a team. Indeed, such competition would only be possible with respect to those players who are left unprotected under Plan B. *Powell v. National Football League,* 690 F.Supp. 812, 813 (D.Minn.1988) (the Plan B "Right of First Refusal/Compensation System has essentially eliminated competition among NFL clubs for player services"). Thus, there is virtually no information sharing between the NFLPA and agents who represent players in actual competition with each other for the same job.

Even assuming that some players are competitors, an allegation that is both absent from the complaint and highly questionable in light of plaintiffs' system of player restraints, such an exchange of information among competitors is not within any of the categories of conduct that is so manifestly anticompetitive as to warrant

---

3. Defendant concedes, for purposes of this mo-
tion, that such an agreement exists.

per se condemnation.[4] *See United States v. Citizens & Southern Nat'l Bank,* 422 U.S. 86, 113, 95 S.Ct. 2099, 2115, 45 L.Ed.2d 41 (1975) ("the dissemination of price information is not itself a *per se* violation of the Sherman Act"). Rather, the Supreme Court has determined that such claims are to be analyzed under the rule of reason because:

> [t]he exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive.

*United States v. United States Gypsum Co.,* 438 U.S. 422, 441 n. 16, 98 S.Ct. 2864, 2875 n. 16, 57 L.Ed.2d 854 (1978); *accord Rosebrough Monument Co. v. Memorial Park Cemetery Ass'n,* 666 F.2d 1130, 1137 n. 4 (8th Cir.1981), *cert. denied,* 457 U.S. 1111, 102 S.Ct. 2915, 73 L.Ed.2d 1321 (1982). The court therefore finds that plaintiffs' allegation of a per se violation based solely on an agreement to exchange salary information fails to state a claim on which relief can be granted. *Cf. Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 762, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984) (constant communication about price and marketing strategy, without more, does not show that competitors are acting in concert rather than making independent pricing decisions); VII Phillip E. Areeda, *Antitrust Law,* ¶ 1510c, at 422 (1986) (although information exchanges between competitors may affect price, such arrangements are "universally excluded from the per se rule against price fixing" because of their procompetitive effects).

Plaintiffs attempt to avoid dismissal of their claim to the extent it alleges a per se violation by arguing that, in addition to the mere exchange of salary information, the complaint also asserts some broader price-fixing scheme involving the NFLPA and player-agents. The complaint states that in furtherance of a combination and conspiracy to fix, raise or maintain compensation to NFL players, the NFLPA engaged in the following activities:

> (a) Collected from and disseminated to player-agents current compensation information, including not only amounts agreed upon between players and clubs, but also amounts offered in ongoing negotiations;
>
> (b) Fixed minimum compensation for contracts for the 1990 season which minimums are expressed as percentage increases over compensation paid during the 1989 season;
>
> (c) Coerced player-agents into cooperating with its illegal conduct by making adherence to it a condition of becoming an NFLPA-approved contract advisor;
>
> (d) Urged player-agents to delay signing contracts so as to force compensation to higher levels approved of by it; and
>
> (e) Insisted on at least one occasion that a player not sign a contract for compensation notwithstanding that the player and the club had previously agreed to such terms.

(Amended Compl. ¶ 74). Defendant contends that those allegations are either too vague to support plaintiffs' claim of a per se price-fixing violation or fail to allege concerted action or agreement between the NFLPA and its alleged co-conspirators, the player-agents. The court will address each contention in turn.

■ For purposes of a motion to dismiss an antitrust claim pursuant to Federal Rule of Civil Procedure 12(b)(6):

> the question is whether, if [the court] accept[s] all allegations—including those relating to purpose and intent—as true, the plaintiffs have successfully pleaded a contract, combination, or conspiracy in

---

**4.** Examples of such per se violations include horizontal price-fixing agreements, *see Federal Trade Comm'n v. Superior Court Trial Lawyers Ass'n,* 493 U.S. 411, 436 n. 19, 110 S.Ct. 768, 782 n. 19, 107 L.Ed.2d 851 (1990) (such conspiracies have been "consistently analyzed" as per se violations); vertical restraints that include "some agreement on price or price levels." *Business Elec. Corp. v. Sharp Elec. Corp.,* 485 U.S. 717, 735–36, 108 S.Ct. 1515, 1525, 99 L.Ed.2d 808 (1988); horizontal agreements to divide territory, *see, e.g., United States v. Topco Assoc.,* 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972); and certain types of tying arrangements, *see, e.g., Northern Pac. Ry.,* 356 U.S. at 5–6, 78 S.Ct. at 518–19.

restraint of trade within the meaning of the Sherman Act.

*Car Carriers, Inc.,* 745 F.2d at 1106.

To state a claim of horizontal price-fixing, plaintiff[s] must allege: (1) the existence of an agreement, combination or conspiracy, (2) among actual competitors ... (3) with the purpose or effect of "raising, depressing, fixing pegging, or stabilizing ... price[s] ..." (4) in interstate ... commerce.

*Cayman Exploration Corp. v. United Gas Pipe Line Co.,* 873 F.2d 1357, 1361 (10th Cir.1989) (quoting *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940)). When evaluating the specificity required for pleading such a claim, the Eighth Circuit has determined that:

[t]he liberal rules of pleading embodied in Fed.R.Civ.P. 8 are as applicable to claims in antitrust or price discrimination cases as they are in any other case. All that is required is a short, plain statement of facts sufficient to give the defendant fair notice of the basis of the claim.

*Fusco v. Xerox Corp.,* 676 F.2d 332, 337 n. 7 (8th Cir.1982) (citations omitted). However, general allegations of conspiracy, without a statement of "the facts constituting the conspiracy, its object and accomplishment", are inadequate to state a cause of action. *See, e.g., Baxley–DeLamar Monuments v. American Cemetery Ass'n,* 843 F.2d 1154, 1156 (8th Cir.1988) (quoting *Larry R. George Sales Co. v. Cool Attic Corp.,* 587 F.2d 266, 273 (5th Cir.1979)).

■ Applying those standards to the complaint, plaintiffs allege that a horizontal price-fixing conspiracy exists and that the NFLPA has "fixed minimum compensation", but other than the salary exchange, assert no specific facts that indicate what acts the NFLPA took to fix prices, what agreements were entered into, with whom such agreements were made or how the goals of the conspiracy were accomplished. Although plaintiffs allege that the NFLPA fixed the minimum compensation level of players subject to the college draft in 1990 at a percentage increase over the salaries

for the previous season, the complaint is devoid of any allegation as to the nature of any such agreement, the parties to such an agreement and the way in which the alleged agreement operated to fix the salary of any specific player. Similarly, plaintiffs' allegations that the NFLPA "urged" unidentified agents to delay signing contracts or "insisted" on one unspecified occasion that an unidentified player refrained from signing a contract lack specificity because they fail to state which players or agents were involved, what actions were taken, at what time and what allegedly occurred as a result. The court thus determines that those allegations are too vague to provide adequate notice of the factual grounds on which plaintiffs' broader price-fixing claim rests. *Cayman Exploration Corp.,* 873 F.2d at 1361 (complaint did not allege horizontal price-fixing claim where plaintiff "did not identify the alleged conspirators, when or how they functioned or the nature and extent of [defendant's] participation in the alleged conspiracy").

■ Those allegations further fail because they merely set forth the NFLPA's unilateral expression of its desires or advice to agents concerning player negotiation goals or tactics. Plaintiffs assert that the NFLPA somehow "[f]ixed minimum compensation for contracts" (Amended Compl. ¶ 74(b)), "[u]rged player agents to delay signing contracts" (*Id.* ¶ 74(d)), and "[i]nsisted on at least one occasion that a player not sign a contract." (*Id.* ¶ 74(e)). Those factual underpinnings, however, contain no allegation that the player-agents agreed to act in accordance with the NFLPA's alleged wishes. Without such concerted action, a section 1 claim fails whether based on rule of reason or per se unlawful activity. *See, e.g., Monsanto Co.,* 465 U.S. at 760–64, 104 S.Ct. at 1469–71. Plaintiffs attempt to remedy that pleading deficiency by asserting that the NFLPA "coerced player-agents into cooperating with its illegal conduct" (Amended Compl. ¶ 74(c)), but fail to specify which agents were so coerced, how they were coerced or even what they allegedly agreed to do or did as a result of such coercion. Thus,

plaintiffs' allegation of coercion by the NFLPA is too nebulous to ascertain what concerted activity underlies the alleged per se violation.[5] *See Garshman v. Universal Resources Holding,* 824 F.2d 223, 230 (3d Cir.1987) ("The allegation of unspecified contracts with unnamed other entities to achieve unidentified anticompetitive effects does not meet the minimum standards for pleading a conspiracy in violation of the Sherman Act."). Moreover, any allegation that the player-agents have acted in conformity with the NFLPA's recommendations or coercion concerning specific negotiating tactics, such as holding out or making higher salary demands, is insufficient to support an inference of collusive conduct because such conduct is wholly consistent with the agents' independent business interests in obtaining the best possible deal for their players. *See, e.g., Cayman Exploration Corp.,* 873 F.2d at 1361 (failure "to allege any facts which would support an inference that the alleged actions by [defendants] would be contrary to their economic interests absent an agreement" warranted dismissal of horizontal price-fix-

ing claim). The court thus concludes that the allegations contained in paragraph 74 of the amended complaint fail because they are either too vague to support plaintiffs' broader price-fixing claim, involving conduct other than or in addition to the salary information exchange, or do not assert concerted action or agreement between the NFLPA and its alleged co-conspirators, the player-agents.

 Even if the court were to construe plaintiffs' allegations as sufficient to state some broader price-fixing conspiracy, the court determines that such an agreement fails to state a per se violation.[6] A practice is to be characterized as a per se violation if such:

> practice facially appears to be one that would always or almost always tend to restrict competition … and in what portion of the market, or instead one designed to "increase economic efficiency and render markets more, rather than less, competitive."

*Broadcast Music, Inc. v. Columbia Broadcasting Sys.,* 441 U.S. 1, 19–23, 99 S.Ct. 1551, 1562–64, 60 L.Ed.2d 1 (1979) (quoting

**5.** Plaintiffs attempt to supplement their complaint with their brief in opposition to defendant's motion to dismiss, arguing that any acts of the NFLPA are sufficient to satisfy the concerted action requirement because the NFLPA is a "voluntary association of competing agents and players." The court did not consider plaintiffs' brief in evaluating the sufficiency of their complaint. *See infra* note 8; *Car Carriers, Inc.,* 745 F.2d at 1107. The court notes, however, that plaintiffs' position is not supported by the law. A trade association is not a "walking conspiracy" of its members. *See, e.g., Consolidated Metal Prods. v. American Petroleum Inst.,* 846 F.2d 284, 293–94 & n. 30 (5th Cir.1988) (when analyzing activities of a trade association "the mere showing of relationships between alleged conspirators is insufficient to imply a conspiracy"); *accord Wilk v. American Medical Ass'n,* 895 F.2d 352, 374 (7th Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 513, 112 L.Ed.2d 524 (1990). Thus, "[t]he mere exchange of information, or even consciously parallel action, is insufficient to establish a conspiracy [involving members of a trade association] under section 1." *Consolidated Metal Prod.,* 846 F.2d at 294 n. 30.

**6.** The court further notes that every circuit court evaluating plaintiffs' player restraints has concluded that such conduct is not per se illegal but should instead be analyzed under the rule of reason. *E.g., Smith v. Pro Football, Inc.,* 593

F.2d at 1181–82 ("the legality of the NFL draft should not be governed by a *per se* rule"); *Mackey v. National Football League,* 543 F.2d 606, 619 (8th Cir.1976) ("the unique nature of the business of professional football renders it inappropriate to mechanically apply per se illegality rules"), *cert. dismissed,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977). If plaintiffs' restraints, which operate in an atmosphere in which they have almost totally eliminated player competition and in which they have been found to have monopoly power, *see United States Football League v. National Football League,* 842 F.2d 1335, 1341 (2d Cir.1988), are to be judged by the rule of reason, the court concludes that any antitrust claims based on actions by the players, their agents or the NFLPA must surely fall into the category of conduct properly judged by the rule of reason.

In *National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Oklahoma,* the Supreme Court similarly determined that because intercollegiate amateur athletics are "an industry in which horizontal restraints on competition are essential if the product is to be available at all", 468 U.S. at 101, 104 S.Ct. at 2690, the National Collegiate Athletic Association's television plan, which operated as a horizontal price-fixing agreement, should nonetheless be analyzed under the rule of reason rather than the per se rule. *Id.* at 100–04, 104 S.Ct. at 2959–62.

*United States Gypsum Co.,* 438 U.S. at 441 n. 16, 98 S.Ct. at 2875 n. 16 and applying rule of reason to a horizontal price-fixing agreement because it increased output and was thus procompetitive); *cf. Drury Inn—Colorado Springs v. Olive Co.,* 878 F.2d 340, 343 (10th Cir.1989) (refusing to apply per se rule to agreement that restrained competition because "[t]he rationale of the rule simply does not fit ... [the] transaction"). Deprived of their ability to seek bids from competing clubs, players negotiating salaries are backed with no economic force and have virtually no opportunity to compete with one another. As a result, the court determines that plaintiffs could prove no set of facts to either support a per se violation based on their allegation that the NFLPA and the player-agents fixed compensation or to demonstrate how such an arrangement could have any possible anticompetitive effect because of plaintiffs' existing system of player restraints. *Cf. United States Football League,* 842 F.2d at 1344 ("In 1966, the NFL and AFL agreed to merge, largely

because the competition for players had sharply increased salaries."). The court therefore concludes that to the extent it alleges a per se price-fixing violation, dismissal of plaintiffs' claim is appropriate because as a result of the present structure of the National Football League, "no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon,* 467 U.S. at 73, 104 S.Ct. at 2232 (citing *Conley,* 355 U.S. at 45–46, 78 S.Ct. at 101–02).[7] Plaintiffs attempt to avoid dismissal by proffering evidence to supplement their complaint. The court, however, rejects that attempt. First, "it is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." *Car Carriers, Inc.,* 745 F.2d at 1107. The court thus examined only the sufficiency of the allegations in plaintiffs' complaint.[8] Moreover, even if the court were to consider plaintiffs' proffered evidence as an amendment to their complaint, the court determines that the evidence does not support their claim of a price-fixing conspiracy.[9]

7. Because plaintiffs can demonstrate no anti-competitive effect as a result of the lack of competition between players for positions and also the absence of competition between plaintiffs for player services, the court further determines that any such claim fails to state a rule of reason violation. *See infra.*

8. A Rule 12(b)(6) motion tests the sufficiency of a claim as pled:

 [t]hus, on a motion under Rule 12(b)(6), the court's inquiry essentially is limited to the content of the complaint....

 5A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1356, at 298 (1990); *see, e.g., Biesenbach v. Guenther,* 588 F.2d 400, 402 (3d Cir.1978) (when confronted with a motion to dismiss, the court limits its consideration to the allegations in the complaint). Rule 12(b)(6) provides, however, that if:

 matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment.

 Fed.R.Civ.P. 12(b)(6). In the present case, the court limited its inquiry to the allegations contained in plaintiffs' complaint and thus did not treat defendant's motion as one for summary judgment.

9. For example, plaintiffs quote deposition testimony from agents reflecting their general belief that access to player compensation information

helps players to negotiate contracts more favorable than they would otherwise be able to negotiate in the absence of such information and that the NFLPA encourages the exchange for that purpose. Even if added to plaintiffs' complaint, however, such allegations do not constitute evidence of an agreement to fix prices. Moreover, the agents also testified that they did not agree with the NFLPA or with other agents to do anything other than exchange salary information, thus undercutting plaintiffs' contention that there is a broader conspiracy to fix players' salaries.

Plaintiffs also proffer an NFLPA document that allegedly sets forth benchmark salaries for 1990 draftees, arguing that the document evidences a price-fixing agreement. That document, however, indicates on its face that it was for internal NFLPA use only and was not to be provided to agents or players. Also absent from either the complaint or plaintiffs' evidentiary submissions are any facts indicating that any agent agreed to adhere to such benchmarks, that the NFLPA had the power to enforce such recommendations or that acts in conformity with such advice would have been contrary to the agent's economic self-interest. The court thus determines that the proffered document fails to support a price-fixing conspiracy.

Plaintiffs also assert that a provision of the NFLPA voluntary code of conduct, under which member agents agree to provide compensation information to the NFLPA, indicates coercion

In sum, the court concludes that plaintiffs' complaint asserts the existence of an exchange of salary information, which is not unlawful per se; conclusory claims of some broader, nebulous price-fixing agreement without adequate factual allegations to support its existence; and vague allegations of unilateral pressure or action by the NFLPA without any specific facts to support plaintiffs' conclusion that such action resulted in a per se unlawful price-fixing agreement. The court thus concludes that plaintiffs' complaint fails to state a per se violation.

### 2. The Rule of Reason

▉▉▉▉ In order to state a rule of reason claim under section 1 of the Sherman Act, a plaintiff must allege concerted action that is intended to harm or unreasonably restrain competition and that actually causes such injury to competition. *Rosebrough Monument Co.*, 666 F.2d at 1138. A plaintiff must further allege a relevant market that has been adversely affected by the challenged restraint; the failure to adequately plead a relevant market is grounds for the dismissal of a rule of reason claim.

by the NFLPA, thus supporting their allegation of the existence of a broader price-fixing conspiracy. As the court previously determined, however, such an exchange of salary information, without more, does not constitute a per se violation of the Sherman Act. Plaintiffs also submit deposition testimony which they contend indicates that agents cooperate in other ways in addition to the exchange of basic salary data. Even if the testimony supports such assertions, however, that evidence does not support the allegation of price fixing by the NFLPA.

Plaintiffs finally cite to a newspaper article concerning the progress of contract negotiations between Lamar Lathon and the Houston Oilers. However, Gene Upshaw and Lathon's agent both denied the contents of that article under oath. Thus, that evidence does not support either the existence of a price-fixing agreement or any claim that the NFLPA or Gene Upshaw were actually in control of those negotiations.

Thus, the court concludes that even if it were to treat plaintiffs' evidentiary submission as a motion for leave to amend, plaintiffs proffer no evidence that would cure the fundamental defects of their complaint. *Cf. Car Carriers, Inc.*, 745 F.2d at 1106 (complaint properly dismissed when there is no reasonable likelihood that the plaintiff can state a claim based on the allegations contained in the complaint).

See, e.g., *Razorback Ready Mix Concrete Co., v. Weaver*, 761 F.2d 484, 488 (8th Cir.1985); *Garshman*, 824 F.2d at 231 (upholding dismissal of rule of reason claim because "allegations suggest no adverse effect on competition in any relevant market"). In their amended complaint, plaintiffs allege the following antitrust injury:

[t]he combination and conspiracy between the NFLPA and player-agents alleged herein is intended to injure, and has the effect of injuring, the plaintiffs in their business and property by increasing the compensation that they must pay professional football players. Each of the plaintiffs herein has suffered injury to its business and property and has been damaged financially by the combination and conspiracy between the NFLPA and player-agents.

(Amended Compl. ¶ 76). Plaintiffs thus allege only injury to themselves; they fail to allege any injury to competition [10] or to define a relevant market in which such injury occurred. *Cf. Car Carriers, Inc.*, 745 F.2d at 1107 (in a rule of reason claim, "the plaintiff must allege, not only an injury to himself, but an injury to the market

10. Plaintiffs fail to allege that they are competitors or how competition has been injured by the exchange of salary information. Moreover, as previously noted, there is almost no competition between member teams for player services or between players for positions because of existing player restraints. *See Schwartz v. Jamesway Corp.*, 660 F.Supp. 138, 141 (E.D.N.Y.1987) (proper pleading of a rule of reason claim requires an allegation of "an injury to competition among several competitors").

The court notes that plaintiffs' failure to allege that they are competitors or that there has been an injury to competition may reflect the position that they have taken in *McNeil v. National Football League* and other cases, that is, that they are not competitors but rather are the equivalent of a single economic entity, and thus are incapable of conspiring within the meaning of section 1 of the Sherman Act. *See, e.g., Los Angeles Memorial Coliseum Comm'n v. National Football League*, 726 F.2d 1381, 1387–90 (9th Cir.1984) (upholding district court's rejection of League's position that they operate as a single entity and are thus incapable of violating section 1), *cert. denied*, 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984); Memorandum in Support of Defendants' Motion for Summary Judgment at 1–4, *McNeil v. National Football League*, 777 F.Supp. 1475 (D.Minn.1991).

as well"); *Caremark Homecare, Inc. v. New England Critical Care, Inc.*, 700 F.Supp. 1033, 1036 (D.Minn.1988) (rule of reason claim requires plaintiff to plead "anticompetitive effect on the market as a whole"). Because of their failure to plead either a relevant market or an injury to competition or the market, the court concludes that plaintiffs' rule of reason claim fails to state a claim on which relief may be granted. *See, e.g., Razorback*, 761 F.2d at 488.[11]

Plaintiffs argue against dismissal on the basis of a failure to adequately plead a rule of reason claim, contending that the court must wait until after the close of discovery and trial to determine whether to apply the per se rule or the rule of reason to their claim. However:

> [w]hen the requisite elements are lacking, the costs of modern federal antitrust litigation and the increasing case load of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint.

*Car Carriers, Inc.*, 745 F.2d at 1106. Thus, courts routinely examine complaints that purport to state both per se and rule of reason claims in order to determine whether the elements of a claim under either theory have been adequately pled. For example, in *Stifel, Nicolaus & Co. v. Dain, Kalman & Quail, Inc.*, the Eighth Circuit separately ruled on each theory in affirming the district court's dismissal of a complaint that alleged both per se and rule of reason violations. 578 F.2d 1256, 1259–62 (8th Cir.1978). After finding that plaintiff's allegations of unfair business practices did not implicate activities "so pernicious and so devoid of redeeming attributes" as to constitute a per se violation, the Eighth Circuit affirmed the dismissal of plaintiff's rule of reason claim because the requisite allegation of anticompetitive impact was absent from the complaint. *Id.* at 1261 (plaintiff conceded that it "alleged no impact on interstate commerce in conformance with the rule of reason"); *see also Garshman*, 824 F.2d at 230–31; *Car Carriers, Inc.*, 745 F.2d at 1108–09; *Schwartz v. Jamesway Corp.*, 660 F.Supp. at 141. The court thus rejects plaintiffs' contention that the court must await further discovery or trial before determining whether to analyze their claim under the per se rule or the rule of reason.

▮▮▮ Even if plaintiffs were to adequately plead a relevant market, the court determines that their claim would nonetheless fail under the rule of reason because they are unable to allege the only type of price information exchange that the Supreme Court has determined constitutes a violation under the rule of reason. As previously discussed, plaintiffs allege only one specific example of concerted action, that the NFLPA and player-agents have acted in concert to share information on player compensation. The Supreme Court

---

**11.** The court further rejects plaintiffs' attempt to evade that requirement by arguing that they do not need to plead a relevant market in a "price-fixing" case. A properly pled price-fixing claim is generally subject to a per se analysis and thus does not require proof of an anticompetitive effect in a relevant market. *But see National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Oklahoma*, 468 U.S. at 100–04, 104 S.Ct. at 2959–62 (analyzing plaintiff's television plan, which operated as a horizontal price-fixing agreement, under the rule of reason); *Broadcast Music, Inc.*, 441 U.S. at 18–24, 99 S.Ct. at 1561–65 (applying rule of reason to horizontal price-fixing agreement). However, to the extent that plaintiffs seek to assert a rule of reason claim, that claim requires that a relevant market is pled. *See Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 555 (7th Cir.1980) ("the absence of a sufficient allegation of anticompeti-

tive effects in a Sherman Act complaint is fatal to the existence of a cause of action.... The only exception to the requirement of an allegation of anticompetitive effects in a Section 1 Sherman Act complaint occurs in the narrow category of *per se* cases.")

The court further rejects plaintiffs' reliance on *Federal Trade Comm'n v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990), to support their contention that they are not required to plead a relevant market. That case is wholly inapposite because it involved no rule of reason claims: the Supreme Court specifically held that the per se rule governed defendants' group boycott and horizontal price-fixing arrangement. *See id.* at 428–36 & n. 19, 110 S.Ct. at 778–82 & n. 19. As previously determined, however, in the present case plaintiffs' allegations fail to state a per se violation.

has determined that, absent some agreement between competitors to restrain price,[12] the exchange of price and other market information is generally benign conduct that facilitates efficient economic activity. *See, e.g., Sugar Inst. v. United States,* 297 U.S. 553, 598, 56 S.Ct. 629, 642, 80 L.Ed. 859 (1936) ("the dissemination of information is normally an aid to commerce"); *Maple Flooring Mfrs' Ass'n v. United States,* 268 U.S. 563, 582, 45 S.Ct. 578, 584, 69 L.Ed. 1093 (1925) ("Competition does not become less free merely because the conduct of commercial operations becomes more intelligent through the free distribution of knowledge of all the essential factors entering into the commercial transaction.").

Plaintiffs argue, however, that the alleged agreement between the NFLPA and player-agents to share information on player compensation constitutes an antitrust violation like that found in *United States v. Container Corp.,* 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969). *Container Corp.* ruled that an exchange of price information among competitors, without an agreement to fix prices, was sufficient to raise antitrust concerns, but only in markets where certain structural conditions exist. *Id.* at 334–36, 89 S.Ct. at 511–12. Those characteristics are: (1) a highly concentrated market dominated by relatively few sellers; (2) a fungible product; (3) competition that is primarily based on price; and (4) inelasticity of demand because buyers tend to order for their immediate short term needs. *Id.* at 337, 89 S.Ct. at 512.[13] Examining those characteristics, the court concludes that such market conditions do not exist in the present case. Plaintiffs neither allege nor can allege that there is a highly concentrated relevant market of competing sellers of players' services because there are over 1,500 professional football players, many of whom are represented in salary negotiations by agents, of whom there are hundreds.[14] In addition, most football players do not compete by selling a fungible product as to which purchasing decisions are primarily made on the basis of price, additional structural factors which are necessary for an information exchange to violate the rule of reason. *See Container Corp.,* 393 U.S. at 337, 89 S.Ct. at 512. Rather, each player has his own unique attributes and skills, which are of

---

**12.** If an exchange of price information also encompasses an agreement to fix prices, that conduct would be subject to the per se rule. *Compare King & King Enters. v. Champlin Petroleum Co.,* 657 F.2d 1147, 1150–54 (10th Cir.1981) (various anticompetitive practices, including an exchange of market and price information, when combined with an agreement to lower and then raise prices to force discounter out of business, demonstrated the existence of a per se illegal price-fixing conspiracy), *cert. denied,* 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982), *with United States v. Citizens & Southern Nat'l Bank,* 422 U.S. at 113, 95 S.Ct. at 2115 ("the dissemination of price information is not itself a *per se* violation of the Sherman Act").

**13.** The court further notes that any doubt about whether *Container Corp.* applied the per se rule or the rule of reason has subsequently been eliminated by the Supreme Court's favorable citation of Justice Fortas's concurring opinion in *Container Corp.* as support for the proposition that "the dissemination of price information is not itself a *per se* violation of the Sherman Act." *Citizens & Southern National Bank,* 422 U.S. at 113, 95 S.Ct. at 2115; *see also Battipaglia v. New York State Liquor Auth.,* 745 F.2d 166, 175 (2d Cir.1984), *cert. denied,* 470 U.S. 1027, 105 S.Ct. 1393, 84 L.Ed.2d 782 (1985).

**14.** The court further notes that the cases on which plaintiffs rely to support their contention all involve relevant markets that were indisputably concentrated. *See, e.g., Container Corp.,* 393 U.S. at 337, 89 S.Ct. at 512 ("the corrugated container industry is dominated by relatively few sellers"); *United States Gypsum Co.,* 438 U.S. at 457, 98 S.Ct. at 2883 (gypsum board industry characterized as "oligopolistic"); *In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.,* 906 F.2d 432, 443–44 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2274, 114 L.Ed.2d 725 (1991) (number of significant rivals in the gasoline market was "sufficiently small" enough to raise antitrust concerns).

None of the cases involve a situation like that in the present case, where the information sharing agreement occurs in a non-concentrated market involving non-fungible products. In the absence of such market concentration, information exchanges are inherently procompetitive. *See* L. Sullivan, *Law of Antitrust,* § 94, at 268 (1977) ("the wide and rapid dissemination of price and related information is one of the prerequisites for a competitive market").

varying desirability to the different teams. Moreover, each player's salary is arrived at during the course of an individual negotiation with his employer club.[15] Finally, the court concludes that there is no inelasticity of demand due to a market of buyers who purchase only for their immediate short term needs. To the contrary, the teams generally sign players to multi-year contracts and the system of player restraints essentially ties each player to his employer club for the duration of his career. Based on the foregoing, the court concludes the market structure of the National Football League does not have the characteristics required by *Container Corp.* and thus plaintiffs cannot allege the requisite factors to establish a rule of reason violation based solely on the exchange of salary information.[16]

 The court further concludes that the alleged salary exchange fails to state a rule of reason violation because any such exchange can have no anticompetitive effect given the present system of player restraints. *E.g., Rosebrough Monument Co.,* 666 F.2d at 1138 (restraint of trade is considered unreasonable if "it has significant anticompetitive effects"); *Caremark*

*Homecare, Inc.,* 700 F.Supp. at 1035; *see National Soc'y of Professional Eng'rs,* 435 U.S. at 688, 98 S.Ct. at 1363 ("Contrary to its name, the [r]ule [of reason] does not open the field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason. Instead, it focuses directly on the challenged restraint's impact on competitive conditions."). Plaintiffs' theory of rule of reason liability is essentially that information concerning the salaries of comparable players is a relevant factor in contract negotiations between an agent and the player's employer club and that having access to such information enables agents to negotiate higher salaries for their players than they would otherwise be able to obtain if forced to negotiate in the dark. Plaintiffs therefore contend that agents' access to such information is somehow anticompetitive. The court, however, rejects that contention. First, plaintiffs fail to allege any anticompetitive effect to either themselves as competitors or the market as a whole. *See supra* note 10. Moreover, as previously discussed, the existing restraints have virtually eliminated competition among plaintiffs for player services and also be-

**15.** As a result of plaintiffs' player restraints, specifically the college draft and the first refusal/compensation system, most players are also unable to compete with each other for the same position on the same team because they are bound to their assigned clubs for the duration of their careers.

**16.** The court concludes that the other cases on which plaintiffs rely in support of their contention that the alleged information sharing agreement between the NFLPA and player agents is sufficient to state an antitrust rule of reason claim are inapposite. In *In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.,* not only was the structure of the gasoline market well within the parameters set by the Supreme Court in *Container Corp.,* but the exchange of price information was, when considered in conjunction with the fact that there was a uniform pattern of pricing among all competitors in the industry and no legitimate reason offered for the exchange, deemed to be sufficient to serve as evidence of a broader price-fixing agreement specifically alleged in that case. 906 F.2d at 441–57. In contrast, in the present case not only is the market structure the opposite of that in *Container Corp.,* but there is also no allegation of specific facts to support

plaintiffs' claim of a broader price-fixing agreement.

For similar reasons, the court concludes that the decision in *Penne v. Greater Minneapolis Area Bd. of Realtors,* 604 F.2d 1143 (8th Cir. 1979), is inapposite. That case involved a wide range of alleged collusive practices engaged in by plaintiffs' competitors, including "punitive" divisions of brokerage commissions, "blacklisting" discount brokers, and making deprecatory statements to plaintiff's customers, all of which were combined with a price-information sharing agreement as part of a broader anti-competitive scheme. *Id.* at 1147–50. The court further concludes that *King & King Enters. v. Champlin Petroleum Co.,* 657 F.2d 1147 (10th Cir.1981), *cert. denied,* 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982), is distinguishable because the exchange of marketing and price information challenged in that case was part of a broader scheme by plaintiff's competitors and suppliers to drive plaintiff, a price discounter, out of business by the use of numerous collusive practices, including threats, providing price allowances to enable plaintiff's competitors to sell below cost, raising and lowering competitors' prices, and withholding marketing information from plaintiff that was shared among plaintiff's competitors. *Id.* at 1150–54.

tween players for positions. As a result, players have little leverage in their salary negotiations. Moreover, it is undisputed that the alleged salary information exchange merely provides agents and players with information that plaintiffs already possess. Although plaintiffs contend that it somehow violates the antitrust laws for agents to have independent access to that same negotiating information, the court determines that the availability of such information can only make the negotiation process fairer because the negotiations can take place without any misunderstanding or misrepresentation about what other players are earning. The court thus concludes that the dissemination of salary information has no anticompetitive effect and may actually benefit competition because it provides players with the same type of information concerning other players' salaries that plaintiffs already possess. *See United States Gypsum Co.,* 438 U.S. at 441 n. 16, 98 S.Ct. at 1365 n. 16 (exchange of price data may increase economic efficiency and thus have procompetitive effect); *cf. Broadcast Music, Inc.,* 441 U.S. at 20–21, 99 S.Ct. at 1562–63 (horizontal price-fixing arrangement was procompetitive because it increased market efficiency and reduced costs).

Based on the foregoing, the court concludes that plaintiffs' complaint fails to state a cognizable antitrust claim under either the per se rule or the rule of reason. Defendant also argues that the court should dismiss plaintiffs' claim with prejudice and without leave to amend. Because the court determines that the defects in plaintiffs' allegations are more than just superficial errors in pleading but are "fundamental inadequacies in their claim" the court determines that Count IV should be dismissed without leave to amend. *See Caremark Homecare, Inc.,* 700 F.Supp. at 1036 (dismissing section 1 claim). Accordingly, defendant's motion is granted and Count IV of plaintiffs' complaint is dismissed with prejudice and without leave to amend.